Commonwealth *v.* Hoffman, Appellant.

Argued January 15, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Harold B. Vikoren*, Assistant Public Defender, with him *Stewart J. Greenleaf*, Public Defender, for appellant.

*Stephen B. Harris*, Assistant District Attorney, with him *Ward F. Clark*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1970:

Appellant was convicted of voluntary manslaughter after a jury trial on an indictment charging him with the murder of one Francis Turbitt. His post-trial motions were denied and judgment of sentence was imposed. Appellant then brought this appeal.

Turbitt's death resulted from injuries he sustained in a fight with appellant on the afternoon of July 9, 1966 at a tavern in Penndel, Pennsylvania. Prior to the fight appellant and seven other men had been engaged in a game of darts in the game room of the tavern. While they were so occupied, Turbitt had entered the game room from the barroom with the cuffs of his trousers rolled up over his ankles. At that time one or more of the group playing darts asked: "Are

you expecting flood waters?" and "Oh, do you have water down in your cellar?" After these remarks, Turbitt went to the shuffleboard game table, sat down on it, rolled his pants up even further and asked the group if anyone was "man enough to own up" to the remarks that had been made. Appellant then approached Turbitt and said, "I was the one who said it. What are you going to do about it?" A slight scuffle ensued but was quickly broken up by the other dart players, two of whom escorted Turbitt outside and suggested that he go home. All eight then resumed the dart game.

About five minutes later, Turbitt re-entered the game room with his pants rolled up even higher, jumped up and down a number of times and said something challenging to appellant. Appellant then left the dart game and quickly went over to Turbitt. Both men went through the swinging door between the game room and a small anteroom. Their heads were seen briefly through a small window in the swinging door by the other dart players, but soon disappeared. Within half a minute after they could no longer see the heads, the other dart players went into the anteroom where they found appellant half-standing, half-kneeling over Turbitt, striking him on the chest and arms. One of the other dart players grabbed appellant, pulled him away from Turbitt and pushed him back toward the others. Turbitt then rose up on one elbow and said something. Immediately, a foot—although no one who testified could identify to whom it belonged—came out and struck Turbitt in the neck. As a result of this blow, Turbitt fell back and commenced "snoring." All but two of the dart players then returned to the game room. The remaining two picked Turbitt up, carried him into the main part of the tavern and placed him on the seat in one of the booths. Turbitt remained there for about an hour until it was noticed that he was having diffi-

culty breathing. An ambulance was then called and Turbitt was taken to the hospital where he died two days later without regaining consciousness.

According to the testimony of the pathologist who performed the autopsy on Turbitt, the only serious injury he had sustained was a massive hemorrhage between the skull and the brain which had forced the base of the brain down and through the foramen magnum, the large opening at the base of the skull through which the spinal cord passes. The resultant squeezing of this part of the brain, which contains all of the vital centers which control such essential activities as heart beat and respiration, had, according to the pathologist, rendered these centers incapable of performing their natural functions and had caused Turbitt's death. In the pathologist's opinion the massive hemorrhage had been caused by a series of blows, rather than a single blow, to the back of the head.

While the above facts were essentially uncontroverted, exactly what had occurred in the anteroom, while only Turbitt and appellant were there, was the subject of conflicting testimony. Consistent with the opinion of the pathologist that the hemorrhage had been caused by a series of blows to the back of the head, the Commonwealth introduced the testimony of one Ernest Shade who had been at the tavern that afternoon and who had spoken with the decedent. Mr. Shade testified that while he was in his automobile preparing to leave the tavern's parking lot he had glanced back toward the anteroom, the exterior door of which was open, and had seen Turbitt's head being "banged" on the floor four or five times. He testified that he had not seen appellant actually causing Turbitt's head to rise and fall, and that upon seeing other men enter the anteroom he had driven away.

Appellant gave a quite different account. He testified that when he and Turbitt arrived in the anteroom, Turbitt swung his fist at appellant, but missed. Appellant then hit Turbitt causing him to fall backward, striking his head on the wall. When he bent down to help Turbitt up, he received a kick in the groin which caused him to fall into the position in which he was found when the other dart players entered the anteroom.

There was testimony that Turbitt, appellant, and all the other dart players had been drinking alcoholic beverages, mainly beer, but that none was drunk at the time of these incidents. Moreover, appellant testified that when he struck Turbitt he had done so without anger or passion. On this evidence, together with rather detailed medical testimony concerning Turbitt's condition and decline in the hospital, the jury returned its verdict.

On this appeal, appellant raises essentially four issues, only the last of which requires detailed consideration.

Appellant first challenges the propriety of the admission of certain evidence. Specifically, he contends that the detailed medical testimony of the three doctors and three nurses who treated Turbitt was repetitious, cumulative and prejudicial. In light of the rather singular injury sustained by Turbitt, we are of the opinion that a detailed account of his decline was appropriate to establish the relationship between the incident at the tavern and his death. Moreover, this testimony was not characterized by descriptions of gore or suffering which would tend to prejudice appellant; it was a factual description of his condition and emphasized his total lack of any feeling or response after his admission to the hospital.

Appellant also contends that the admission of two sections of the tile-covered concrete anteroom floor as

physical exhibits was prejudicial. These exhibits, purportedly the section of the floor where Turbitt's head had been struck, were admitted only under the trial court's careful instruction that they were for the sole purpose of showing the composition of the floor. This was relevant, and we fail to see that it was prejudicial.

As a final evidentiary point, appellant complains that he was prejudiced by a photograph of Turbitt showing him in the company of a small child. The short answer to this point is that, although this photograph was marked for identification, and used by various witnesses to identify the decedent, it was neither admitted into evidence nor shown to the jury because of appellant's objections.

Appellant's second contention is that the trial court erred in denying his motion for a mistrial because the Commonwealth's attorney in his opening statement to the jury referred to appellant as a man with the "heart of a sadist"[1] and as a man with a "sadistic" heart. In determining whether statements in a prosecutor's opening address are prejudicial, "[t]he important question is whether the prosecuting officer's remarks are merely assertions intended to inflame the passions of the jury, or statements that are fair deductions from evidence to be presented." *Commonwealth v. Meyers,* 290 Pa. 573, 139 Atl. 374 (1927); *Commonwealth v. Cannon,* 386 Pa. 62, 69, 123 A. 2d 675 (1956), *cert. denied,* 352 U.S. 898 (1956). The Commonwealth was seeking a conviction of second degree murder, one of the essential elements of which is malice. *Commonwealth v. Finnie,* 415 Pa. 166, 171, 202 A. 2d 85 (1964). It argues that "sadistic heart" and "malicious heart" are essentially the same

---

[1] *The Random House Dictionary of the English Language* defines sadism as: "1. sexual gratification gained through causing physical pain or humiliation. 2. any enjoyment in being cruel." Thus a sadist is one who derives enjoyment from being cruel.

and that the statement was but a fair inference to be drawn from the evidence to be presented.

While we perceive a difference in the connotations of the two words which renders sadistic a more pejorative adjective than malicious, we believe no prejudice resulted from its use here, as the jury, by finding appellant guilty of voluntary manslaughter, and not second degree murder, found he had not acted even with malice. In *Commonwealth v. Meyers, supra,* we stated the standard for reversal in cases such as this as follows: "Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not fairly weigh in his behalf such circumstances of doubt, extenuation or degree of guilt that may be present in the case, and thus make them unable to render a true verdict."[2] (290 Pa. 581.) The language used here did not rise to that standard.

The third of appellant's arguments is that he was prejudiced by the presence, in the jury room or "lounge", of the justice of the peace who had presided at his preliminary hearing. The justice of the peace had been called for jury duty, had reported, and was not detected or removed for ten minutes. Appellant's counsel was informed of this incident before trial by the trial judge but neither moved for a continuance nor asked any prospective juror on voir dire if he had had any conversation with the justice of the peace. No evidence was introduced to indicate any improper con-

---

[2] Cf. *Commonwealth of Pennsylvania v. Smith,* 270 Pa. 583, 588, 113 Atl. 844 (1921), in which the Court held that the district attorney's remark in his closing address that defendant "didn't have the heart of a man, or the soul of a man," did not require a reversal.

tact between any juror and the justice. Without a scintilla of evidence of impropriety we cannot say that appellant was prejudiced by this occurrence.

The final issue is the propriety of the voluntary manslaughter conviction where the evidence did not establish that appellant acted while under the influence of passion engendered by sufficient legal provocation and without time to cool. Appellant contends that these were necessary elements of a conviction of voluntary manslaughter, that they were not established and that the jury properly had no option but to acquit if they did not find appellant guilty of murder. The Commonwealth concedes that the evidence does not support a verdict of voluntary manslaughter but asserts that since the evidence would support a finding of second degree murder—the degree of homicide the jury was asked by the Commonwealth to find—the voluntary manslaughter conviction may not be disturbed.

As summarized by the court below, the evidence considered in the light most favorable to the Commonwealth would have supported a second degree murder conviction in that the jury might have found that the appellant, lacking legal provocation and in excess of the bounds of self-defense, with a certain hardness of heart and with an intention to inflict serious bodily harm, banged the decedent's head against the concrete-bottomed floor four or five times, and in so doing caused the injury which resulted in decedent's death. The lower court, believing the case ruled by *Commonwealth v. Frazier*, 420 Pa. 209, 216 A. 2d 337 (1966), concluded that on this evidence our law will allow the verdict of voluntary manslaughter to stand. We agree.

Few propositions are better established in the criminal law than the doctrine that where the evidence would be sufficient to support a conviction of murder, the return of a verdict of voluntary manslaughter is

strictly within the jury's prerogative even in the absence of provocation and passion.[3] Appellant seeks to avoid the impact of the rule by distinguishing the instant case from one of our more recent cases restating that doctrine, *Commonwealth v. Cooney*, 431 Pa. 153, 244 A. 2d 651 (1968). He points out, first, that in *Cooney* the jury had the option of finding the defendant guilty of involuntary manslaughter since he was indicted for that offense as well as murder, whereas here the jury did not have that option. Appellant asserts that had the jury been instructed that they could find appellant guilty of involuntary manslaughter they would have chosen "that more appropriate alternative." Since there was no indictment for involuntary manslaughter, the court, of course, did not err in not charging on it. The absence of an indictment for involuntary manslaughter was not prejudicial to appellant nor did it prevent the rule under discussion from operating. The court clearly instructed the jury that if the Commonwealth failed to meet its burden of proving beyond a reasonable doubt every element of either murder or voluntary manslaughter, the jury should acquit appellant. This distinction from *Cooney* is one of no significance.

Appellant also attempts to invalidate the manslaughter verdict on the ground that the evidence in

---

[3] *Commonwealth v. Harry*, 437 Pa. 532, 264 A. 2d 402 (1970); *Commonwealth v. Dennis*, 433 Pa. 525, 252 A. 2d 671 (1969); *Commonwealth v. Cooney*, 431 Pa. 153, 244 A. 2d 651 (1968); *Commonwealth v. Pavillard*, 421 Pa. 571, 220 A. 2d 807 (1966); *Commonwealth v. Frazier*, 420 Pa. 209, 216 A. 2d 337 (1966); *Commonwealth v. Frazier*, 411 Pa. 195, 191 A. 2d 369 (1963); *Commonwealth v. Moore*, 398 Pa. 198, 157 A. 2d 65 (1959); *Commonwealth v. Nelson*, 396 Pa. 359, 152 A. 2d 913 (1959); *Commonwealth v. Steele*, 362 Pa. 427, 66 A. 2d 825 (1949); *Commonwealth v. Arcuroso*, 283 Pa. 84, 128 Atl. 668 (1925); and *Commonwealth v. Kellyon*, 278 Pa. 59, 122 Atl. 166 (1923).

this case did not establish all the elements of murder *beyond a reasonable doubt* which the *Cooney* opinion appears to make a prerequisite to upholding the voluntary manslaughter conviction.[4]   As the cases enunciating the doctrine make clear, all that is required before a conviction of voluntary manslaughter in the absence of passion and provocation will be allowed to stand is that the evidence be such that the jury *could* have found present every element of murder.   We are satisfied from our review of the record that the jury could have so found in the present case.   While the rule under discussion may seem somewhat anomalous in light of the unquestioned requirement that the Commonwealth establish every element of any crime beyond a reasonable doubt, it arises from the fact that voluntary manslaughter is a lesser offense than murder, but one included within an indictment therefor, and an appreciation that the jury may be reluctant to find a man guilty of the extreme crime of murder.

In *Commonwealth v. Kellyon*, 278 Pa. 59, 122 Atl. 166 (1923), the Court discussed the doctrine at some length and elucidated its origins.   First, the Court recognized that manslaughter was at common law, as it is today, an offense less than and included in the crime of murder, the distinguishing element being the absence of malice in voluntary manslaughter.[5]   It is also noted that a jury has the power to find a defendant guilty of a lesser included offense and that this power permits

---

[4] "Where the Commonwealth's evidence, together with all reasonable inferences therefrom . . . is adequate to establish beyond a reasonable doubt a conviction of murder, the jury may convict the defendant of voluntary manslaughter, even in the absence of evidence of passion." *Commonwealth v. Cooney*, 431 Pa. at 157.

[5] See the definitions of the two crimes in *Commonwealth v. Finnie*, 415 Pa. 166, 170, 202 A. 2d 85 (1964) and *Commonwealth v. Drum*, 58 Pa. 9, 17 (1868).   See also 1 Wharton's Criminal Law §271, p. 575.

the return of a verdict of voluntary manslaughter on a murder indictment. Because manslaughter is a lesser offense than murder, the Court concluded that a defendant could not properly complain of a verdict finding him guilty thereof on evidence which would show him to be guilty of the greater offense. The emphasis in our subsequent cases on the necessity of passion and provocation to reduce an intentional killing to voluntary manslaughter in no way alters the fact that voluntary manslaughter is a lesser included offense of murder.

Finally, the Court in *Kellyon,* quoting from 13 Ruling Case Law 757, Section 65, noted, "[t]he courts recognize that it is not an uncommon thing for a jury, out of sympathy, or what they conceive to be extenuating circumstances, to find a defendant guilty of a lower degree or grade of offense than that of which the evidence clearly convicts him; but the fact that they do so is not a ground of reversal of the verdict and judgment" 278 Pa. at 64.[6] Thus the Court frankly recognized that factors which do not comport strictly with jurisprudential doctrine may cause a jury to refuse to find a criminal defendant guilty of the extreme crime of murder, but to be willing to find him guilty of a lower degree of homicide.

In short, the rationale of the doctrine under discussion is found in a combination of two factors: a realistic appreciation of the humanity of those who sit on our juries, and the legal concept that voluntary manslaughter is by definition a lesser offense than murder but one included within a murder indictment.

Judgment of sentence affirmed.

Mr. Justice ROBERTS concurs in the result.

---

[6] Other jurisdictions have also adopted this reasoning. See Am. Jur. 2d *Homicide,* §543, p. 802.