Commonwealth *v.* Matthews, Appellant.

Argued January 19, 1971. Before Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*Abraham J. Brem Levy,* for appellant.

*Louis A. Perez, Jr.,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

Opinion by Mr. Justice Eagen, December 29, 1971:

William Matthews, sentenced to life imprisonment following his conviction by a jury of murder in the first degree, appeals from the judgment of sentence.

The sufficiency of the trial evidence to sustain the verdict is not questioned, nonetheless, we have studied the record and are satisfied the evidence was ample to establish Matthews' guilt of murder in the first degree beyond a reasonable doubt.

From the evidence, the jury was warranted in finding that Matthews, on February 23, 1968, acting in concert with his nephew, James Williams, and a friend, James Jackson, robbed Randolph Butts in Philadelphia and during the perpetration of the robbery Butts was stabbed four times by one of the felons, causing injury which resulted in Butts' death.

Appellant cites several alleged errors during the prosecution proceedings which he asserts require a new trial. We conclude these assignments of error are without merit for the reasons that follow.

During the investigation of the crimes involved, the police apprehended and questioned Williams, who admitted having participated in the commission of the robbery, and accused Matthews and Jackson of also having participated and informed the police that Matthews had hidden the knife used in the stabbing in an apartment at a certain address. Based on this information, an investigating officer caused a search warrant to issue for the apartment. The complaining affidavit, signed by a police detective, Verbrugghe, stated the following: "On Fr. 2-23-68 about 11:00 p.m. Randolph Butts 40-N., 4-38 Green St., was taken from the highway 3856 Haverford Ave. to the Presbyterian Hosp., and pronounced dead from stab wounds of the back. Investigation disclosed that James Williams 18-N., res. 3856 Haverford Avenue took part in the robbery of Randolph Butts. James Williams stated that William Matthews 18-N., 3856 Haverford and James Jackson 19-N., 4422 Brown St., had stabbed Randolph Butts and hid the knife in the 3rd floor apartment [rear] of 3856 Haverford Ave." The warrant described the property sought as "one pocket knife" and bloody clothing worn by William Matthews on Friday, February 23, 1968.

Upon arriving at 3856 Haverford Avenue at 12:30 a.m., on February 24th, (the apartment of appellant's sister), the police took appellant into custody, placed him under arrest, and pursuant to the warrant seized an eight-inch kitchen knife (otherwise described as a "butter knife").

Initially, appellant suggests that the affidavit upon which the search and seizure warrant was based lacks the requisite information for a finding of probable cause.

The foundation of the law of search and seizure is the Fourth Amendment, which is binding on the states under the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961). The Fourth Amendment in pertinent part provides: "No warrants shall issue, but upon probable cause, supported by Oath or affirmation. . . ." And it is now well established that a magistrate may not constitutionally issue a search warrant until he is furnished with information sufficient to persuade a reasonable man that probable cause for the search exists. *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964). The purpose of requiring this information is to give the magistrate the opportunity of knowing and weighing the facts and determining objectively for himself the need for invading a person's privacy in order to enforce the law. *McDonald v. United States*, 335 U.S. 451, 69 S. Ct. 191 (1948). His decision must be based solely on the information brought to his attention. *Aguilar v. Texas*, supra; *Giordenello v. United States*, 357 U.S. 480, 78 S. Ct. 1245 (1958). He must render his decision based on a commonsense reading of the entire affidavit. *United States v. Ventresca*, 380 U.S. 102, 85 S. Ct. 741 (1965); *Commonwealth v. Payton*, 212 Pa. Superior Ct. 254, 243 A. 2d 202 (1968). Thus

the long standing principle, that probable cause will be determined by a "neutral and detached magistrate" and not by "the officer engaged in the often competi-. tive enterprise of ferreting out crime", *Johnson v. United States,* 333 U. S. 10, 68 S. Ct. 367 (1948), will be complied with.

The appropriate benchmark for a determination of whether a search and seizure warrant is valid is *Aguilar v. Texas,* supra, as explicated in *Spinelli v. United States,* supra. In these two cases the United States Supreme Court developed the following two-pronged test for ascertaining the validity of a warrant: "First, the application failed to set forth any of the 'underlying circumstances' necessary to enable the magistrate independently to judge of the validity of the informant's conclusions. . . . Second, the affiant-officers did not attempt to support their claim that their informant was 'credible' or his information 'reliable'." 393 U.S. 413, 89 S. Ct. at 587.

The thrust of appellant's argument seems to go to the second facet of the aforementioned test in that the requesting officer did not attempt to support his claim that the informant was credible or his information reliable. The Commonwealth counterargues that since the informant was a participant in the crime "and he personally witnessed, and was a party to, the events related to Detective Verbrugghe" this should insure his reliability.

The case law is clear that when a person is an admitted participant in a crime, and the police attempt to secure a warrant upon the information received from him, the second aspect of the Supreme Court's test is met, since the fact that the individual admits participation in the crime insures his reliability. See generally, *United States v. Viggiano,* 433 F. 2d 716 (2d Cir. 1970); *Louie v. United States,* 426 F. 2d 1398 (9th Cir. 1970);

*Gilbert v. United States,* 366 F. 2d 923 (9th Cir. 1966);
*Owens v. Scafati,* 273 F. Supp. 428 (D. Mass. 1967);
*Commonwealth v. Stewart,* Mass. , 267 N.E. 2d
213 (1971); *Commonwealth v. Rose,* 211 Pa. Superior
Ct. 295, 235 A. 2d 462 (1967).

All of the above cases, however, are slightly distinguished from the instant case in that therein there was corroboration from other police information, or the affidavit stated that the informant was an "admitted" participant in the crime, whereas in the instant case there is little corroborating information to insure reliability, and the affidavit does not expressly state that Williams was an admitted participant in the crime. The affidavit herein merely states that investigation disclosed that "James Williams 18-N., res. 3856 Haverford Avenue took part in the robbery of Randolph Butts." Thus, there is no direct showing, on the face of the affidavit that Williams, the informant, had actually confessed or made inculpatory statements that would tend to show his reliability.

However, the United States Supreme Court in *United States v. Ventresca,* supra, at 108-09, 85 S. Ct. at 746, stated that the affidavit "must be tested and interpreted by . . . [this Court] in a common-sense and realistic fashion", and that we "should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense manner", and that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants". Based on this guideline, it is our view that a common-sense reading of the affidavit involved is sufficient to establish Williams is reliable since he was a "known" participant in the crime, and the magistrate could properly presume Williams knew anything he said would or could be used to implicate him in the crime, and he would not be

inclined to give false information about himself, or his uncle, the appellant.

Moreover, his recitation of the manner in which the crime was committed was corroborated by the police investigation, since it was clear that a murder had been committed and it occurred as a result of stab wounds, as the informer stated, leading to the conclusion he had first-hand information.

The appellant's next contention is that the kitchen knife seized and put in evidence as the murder weapon should have been suppressed because of the "slipshod manner in which Detective Verbrugghe approached his duties when he described the knife he was looking for as a pen knife; whereas he actually confiscated a silver kitchen knife."

The affidavit stated that the item to be seized was merely a knife, but the warrant limited the description to "one pocket knife". According to testimony elicited during the suppression hearing below, when the detectives entered the apartment where appellant was staying, they asked Valerie Williams (an occupant of the apartment) where the "knife" used in the killing was. She pointed it out in a pan of water under the kitchen table and, as previously noted, the knife was a kitchen knife rather than a "pocket knife". Thus it is clear that the knife seized does not exactly match the description given in the warrant.

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no warrant shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized.*" [Emphasis added.]

The United States Supreme Court in the case of *Marron v. United States,* 275 U.S. 192, 48 S. Ct. 74 (1927), discussed the Fourth Amendment requirement of particularity in the following terms: "The requirement that warrants shall particularly describe the things to be seized *makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officers executing the warrant."* [Emphasis added.] *Id.* at 196, 48 S. Ct. at 76.

It cannot be disputed that general or exploratory searches through which officers merely hope to discover evidence of *any* kind of *any* wrongdoing are not constitutionally permissible. The search must be one directed in good faith towards the objects specified in the warrant. Cf. *United States v. Rabinowitz,* 339 U.S. 56, 70 S. Ct. 430 (1950); *United States v. Lefkowitz,* 285 U.S. 452, 52 S. Ct. 420 (1932); *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S. Ct. 153 (1931).

We are convinced the search in this case was not "exploratory", but rather one directed in good faith towards the object specified in the warrant. To rule otherwise, merely because the warrant specified a "pocket knife" whereas "a kitchen knife" was seized would be hypertechnical and contrary to the common-sense approach mandated in *United States v. Ventresca,* supra Cf. also, *State v. Pietraszewski,* 285 Minn. 212, 172 N.W. 2d 758 (1969). Moreover, in this connection, we note that several courts have ruled that where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item he is seeking. For example, see *James v. United States,* 416 F. 2d 467 (5th Cir. 1969), cert denied 397 U.S. 907, 90

S. Ct. 902 (1970); *United States v. Melville,* 309 F. Supp. 822 (S.D. N.Y. 1970); and, *United States v. Robinson,* 287 F. Supp. 245 (N.D. Ind. 1968).

Appellant next contends constitutional due process was violated at trial by the evidentiary use of a confession he made to the police.

Matthews testified that the confession was coerced through threats of physical violence and that his request for a lawyer during the period of police questioning was ignored. However, this testimony was specifically contradicted by the police officer to whom the confession was given. This officer denied the existence of any coercion and stated no questioning occurred until after Matthews had been fully informed of his rights as mandated by "Miranda", and indicated he understood his rights and was willing to make a statement without the assistance of legal counsel. Under the circumstances, the credibility of Matthews' testimony was for the fact-finders below, and we find nothing in the record to cause us to interfere with their rejection of his testimony. Cf. *Commonwealth v. Abrams,* 443 Pa. 295, 278 A. 2d 902 (1971); and *Commonwealth ex rel. Joyner v. Brierley,* 429 Pa. 156, 239 A. 2d 434 (1968).

Appellant next asserts the trial court committed error in refusing a specific request to instruct the jury on voluntary manslaughter, and also in failing to submit to the jury such a finding as a possible verdict. Since there was no evidence which pointed in the slightest degree to the offense of manslaughter, the court's action did not constitute error. *Commonwealth v. LaRue,* 381 Pa. 113, 112 A. 2d 362 (1955); and *Commonwealth v. Flax,* 331 Pa. 145, 200 A. 632 (1938).

Appellant next contends due process was violated at trial by excusing jurors for cause merely because they indicated conscientious scruples against the impo-

sition of the death penalty, because this prevented the accused from being tried by a jury which was a cross section of the community. This contention was considered and rejected in *Commonwealth v. Speller*, 445 Pa. 32, 282 A. 2d 26 (1971), and we stand on our decision in that case. See also *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788 (1968); and, *Commonwealth v. Roach*, 444 Pa. 368, 282 A. 2d 382 (1971).

In this connection, appellant advances another argument not considered in *Speller*, namely, that the excusing of jurors for cause because of conscientious scruples violates the Due Process Clause of the Fourteenth Amendment, since a jury has absolute discretion in the fixing of the penalty and "could conceivably act differently in different cases." *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S. Ct. 518 (1966), is cited support of this position.

*Giaccio* is inapposite. Therein the court ruled unconstitutional a Pennsylvania statute permitting a jury to place the costs on a defendant charged with a misdemeanor even though it found him *not* guilty of the crime. The thrust of the decision was that the statute was too vague and lacked sufficient standards to enable the accused to protect himself against arbitrary and discriminatory imposition of costs. Herein, the proscribed act is the taking of another human life, and there is nothing vague about that.

Furthermore, in speaking for the majority in *Giaccio*, the late Mr. Justice BLACK disposed of the contention now under discussion when he said: "In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits." *Id.* at 405, n. 8, 86 S. Ct. at 522, n. 8.

Finally, we note that the United States Supreme Court in the recent case of *McGautha v. California,* 402 U.S. 183, 91 S. Ct. 1454 (1971), while speaking on this very issue rejected the claim that there was a due process violation. Therein the Court pertinently stated: "We consider first McGautha's and Crampton's common claim; that the absence of standards to guide the jury's discretion on the punishment issue is constitutionally intolerable. To fit their arguments within a constitutional frame of reference petitioners contend that to leave the jury completely at large to impose or withhold the death penalty as it sees fit is fundamentally lawless and therefore violates the basic command of the Fourteenth Amendment that no State shall deprive a person of his life without due process of law. Despite the undeniable surface appeal of the proposition, we conclude that the courts below correctly rejected it." *Id.* at 196, 91 S. Ct. at 1461. The Court went on to state: "In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammelled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of circumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless 'boiler-plate' or a statement of the obvious

that no jury would need." *Id.* at 207-08, 91 S. Ct. at 1467-68.

Appellant also urges that there is an equal protection violation inherent in the present jury system. This contention is totally devoid of merit. Generally speaking, the equal protection clause requires a government to treat all those standing in the same position equally, i.e., a government cannot discriminate against a class or group of individuals. In cases such as here involved, there is no discrimination—all those who are found guilty of murder in the first degree can either have their punishment fixed at death or life imprisonment, and that determination rests with the jury *based on the facts of each case.* There is no apparent, or invidious discrimination against an individual, a group, or a class since the facts of each case are different and the jury makes its determination of the degree of guilt based solely on the facts in the case before it.

Finally, it is urged the trial court favored the Commonwealth and failed to act fairly and impartially throughout the proceedings. Our examination of the record fails to persuade us that there is any merit in this contention.

Judgment affirmed.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I join the dissenting opinion of Mr. Justice POMEROY and also wish to add two additional brief observations.

First, many of our cases decided prior to *Commonwealth v. Flax,* 331 Pa. 145, 200 Atl. 632 (1938), accepted without question the proposition "that on a trial for murder where there is no evidence which in the

remotest degree points to the offense of manslaughter, the court commits no error in instructing the jury that a verdict of guilty of manslaughter would not be warranted." *Commonwealth v. Yeager,* 329 Pa. 81, 85, 196 Atl. 827, 830 (1938); accord *Commonwealth v. Carroll,* 326 Pa. 135, 191 Atl. 610 (1937); *Commonwealth v. Crossmire,* 156 Pa. 304, 27 Atl. 40 (1893); *Commonwealth v. Buccieri,* 153 Pa. 535, 26 Atl. 228 (1893). The subsequent restatement of that rule seems to have been made without any apparent awareness of the substantive difference between the principle of *Yeager,* supra, and *Flax* and the cases decided thereafter.

Mr. Justice POMEROY, in his dissent, has focused on the denial of equal protection and the basic weakness in the rule which the majority here again reiterates. I believe we should not let this case pass without correction.

Secondly, it is of course unarguable that voluntary manslaughter is a lesser included offense in an indictment for murder. The jury should be so instructed. Furthermore, the jury should be advised that a verdict of voluntary manslaughter is one of the verdicts returnable under a murder indictment. The failure to do so obviously creates many potentials for incomplete, unfair, and unequal considerations in the deliberations of the jury and the verdict and treatment accorded the accused.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

Among appellant's several assignments of error is the trial court's refusal of a specific request for an instruction to the jury on the elements of voluntary manslaughter as being one of the possible verdicts the jury may return in a murder case. The opinion of this Court summarily rejects this assignment on the ground that ". . . there was no evidence which pointed in the

slightest degree to the offense of manslaughter". There is, admittedly, precedential support for this conclusion, and it reflects the long standing practice in our criminal courts. Upon reflection, however, I believe that logic and fairness mandate a different result, and I therefore respectfully dissent.

Because of the brevity of the majority's treatment of this issue, it may be helpful to summarize the current status of the law with respect to (1) jury instructions on voluntary manslaughter, and (2) the return by the jury of a voluntary manslaughter verdict in trials for murder wherein there has been no evidence to support such a verdict.

While it is considered felonious, voluntary manslaughter is the least culpable form of homicide included within a murder indictment. Thus, when considering the degree of culpability of an individual being tried under such an indictment, a jury may return a voluntary manslaughter verdict if it finds that the killing, although intentional, was committed without malice; that is, the accused may be shown to have been acting under the influence of sudden passion which was caused by legally adequate provocation that placed him beyond the control of reason.[1]  See e.g., *Commonwealth v. Walters*, 431 Pa. 74, 244 A. 2d 757 (1968); *Commonwealth v. Paese*, 220 Pa. 371, 69 Atl. 891

---

[1] The difference in culpability between first or second degree murder on the one hand and voluntary manslaughter on the other is reflected in the punishments which accompany conviction of these respective offenses. Thus, a conviction for first degree murder carries with it a sentence of death or life imprisonment. Sanctions that may properly be imposed upon one found guilty of second degree murder include imprisonment for a term not exceeding twenty years and a fine up to ten thousand dollars. Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701. Punishment for voluntary manslaughter, in contrast, may not exceed twelve years imprisonment and six thousand dollars fine. Act of June 24, 1939, *supra*, §703, 18 P.S. §4703.

(1908). These elements need not always be present, however, to support a voluntary manslaughter verdict. Pennsylvania courts have long accepted the common law rule that the jury has the power to find a defendant guilty of voluntary manslaughter even in the absence of passion or provocation, where the evidence is sufficient to support a first or second degree murder verdict. *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A. 2d 726 (1970); *Commonwealth v. Kellyon*, 278 Pa. 59, 122 Atl. 166 (1923); *Commonwealth v. Gable*, 7 S. & R. 423 (1821). Although superficially such a rule may seem incongruous, it does have a rational basis. In essence, the rationale of the rule is founded on two considerations: (1) the legal concept that voluntary manslaughter is by definition a lesser offense than murder but one included within a murder indictment, (2) a realistic appreciation of the fact that factors such as sympathy or extenuating circumstances may lead a jury to find a defendant guilty of the lesser included offense of voluntary manslaughter even though the evidence is enough to establish guilt of murder in the second or even the first degree. *Commonwealth v. Hoffman*, supra.

Imposed upon this conceptual framework is a second rule which the majority here reaffirms. That rule gives a trial judge complete discretion in deciding whether or not to submit voluntary manslaughter to the jury as a possible verdict in a case where there is no evidence of passion or provocation. See e.g., *Commonwealth v. LaRue*, 381 Pa. 113, 112 A. 2d 362 (1955); *Commonwealth v. Yeager*, 329 Pa. 81, 196 Atl. 827 (1938). The reason for this rule is said to be that a charge on a point or issue which is unsupported by any evidence ". . . is likely to confuse the jury and obstruct justice". *Commonwealth v. Pavillard*, 421 Pa. 571, 220 A. 2d 807 (1966).

Thus, while a jury has the power to return a verdict of guilty of the lesser included offense of voluntary manslaughter in every case tried pursuant to a murder indictment, this power may be effectively negated by the decision of a trial judge to refuse to charge the jury on this point. In making this decision, the judge has no standards to guide him and there are no safeguards which would militate against the exercise of whim or caprice. In discussing this anomolous situation in his dissenting opinion in *Commonwealth v. Pavillard, supra,* Mr. Justice COHEN (joined by Mr. Justice JONES) cogently stated: "How is a jury able to exercise its power [to bring in a voluntary manslaughter verdict] when it is never advised that it has such power? That rule has led to arbitrary justice . . . since trial judges have capriciously chosen to charge the doctrine or not."

In my view, the due process and equal protection clauses of the Fourteenth Amendment require the abandonment of the procedure now again sanctioned by the court. Due process is violated where a state procedure denies to those subject to it the fundamental fairness required in a system of ordered liberty. *Rochin v. California,* 342 U.S. 165, 169, 96 L. Ed. 183 (1952). The procedure here, grounded as it is upon the exercise of absolute discretion by the trial judge, without the benefit of any objective standards to guide him, is patently arbitrary and unfair.

Likewise, the equal protection clause is offended where a state cannot show a rational basis for discrimination between persons or groups of persons. *Cf. Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 225 (1971); *Dandridge v. Williams,* 397 U.S. 471, 25 L. Ed. 2d 491 (1970); *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600 (1969). In the case at bar, it seems impossible to discover a rational nexus between the Common-

wealth's interest in keeping from the jury instructions which might lead a jury to return a less harsh verdict or perhaps even a logically unjustified verdict, and the method by which the Commonwealth seeks to vindicate that interest. It would seem that the interest of the Commonwealth is adequately protected by the fact that the trial judge may, indeed should, advise the jury that, where no evidence of provocation or passion has been presented, a verdict of voluntary manslaughter would not be warranted. *Commonwealth v. Yeager, supra.*[2]

---

[2] An example of an acceptable jury charge in the circumstances of the instant case can be found in Laub, *Pennsylvania Trial Guide,* §618.5: "Under the law, you are entitled to bring in a verdict of voluntary manslaughter. That is a question for you and we may not interfere with your judgment in the matter. In our opinion there is no evidence of any sufficient cause of provocation which, if this were a malicious killing, would reduce it to voluntary manslaughter, but that is our opinion merely and it is not binding upon you. It is for you and you alone to say whether this was a case of voluntary manslaughter and we have no right to decide that issue. One of the permissible verdicts in cases of this type is a verdict of guilty of voluntary manslaughter and the court has no right to deprive you of the privilege of so declaring if you wish."

I would distinguish this type of admonition from what I believe to be improper judicial comments which suggest a verdict of guilty or not guilty, or directly express an opinion on the accused's guilt or innocence. An instruction such as suggested above merely suggests to the jury that the evidence is insufficient to show passion or provocation. In my view, such a jury charge conforms with the *American Bar Association Standards Relating to Trial by Jury,* which permit the court to comment on the evidence provided that the jury is ". . . clearly and unequivocally instructed that it is the exclusive judge of the facts . . . and that it is not bound by the comments of the court." §4.7 (Approved Draft, 1968). In no way does the above proposed instruction imply that a not guilty verdict would be improper, nor could the jury infer from such a comment that a second or first degree murder verdict would be impermissible; the jury remains untainted by any judicial suggestion of the *ultimate* guilt (or degree of guilt) or innocence of the accused.

It has been said that our ". . . constitutional guaranties of due process and equal protection both [call] for procedures in criminal trials which allow no invidious discriminations betwen persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, stand on an equity before the bar of justice in every American court." *Griffin v. Illinois,* 351 U.S. 12, 17, 100 L. Ed. 891, 898 (1956). Seeking to apply this principle to the situation before us, I am of the view that as long as we allow juries the latitude we do in homicide cases, as above set forth, criminal defendants must be treated equally by informing all juries of the verdicts they have the power to return. This means that the trial court should not have discretion whether or not to instruct on the elements of voluntary manslaughter; it should be obliged to do so in every murder trial, but with proper cautionary admonition such as that set forth in footnote 2.

I would vacate the judgment of sentence and remand for a new trial.

Mr. Justice ROBERTS joins in this dissenting opinion.