546 A.2d 1241

COMMONWEALTH of Pennsylvania

v.

Gregory Brent HARNER, Appellant.

Superior Court of Pennsylvania.

Argued June 14, 1988.

Filed Aug. 15, 1988.

Elizabeth J. Maitland and Edward J. McCormick, III, Littlestown, for appellant.

Roy A. Keefer, Assistant District Attorney, Gettysburg, for Com., appellee.

Before CIRILLO, President Judge, WIEAND and DEL SOLE, JJ.

WIEAND, Judge:

Craig Rice, a student at Gettysburg High School, disappeared after school on November 12, 1985. His body, in various stages of decomposition, was found in a wooded area, near a stream, on March 28, 1986. Gregory Brent

Harner, a classmate, was subsequently arrested and charged in separate counts of the same information with first degree murder,[1] third degree murder,[2] voluntary manslaughter committed in the heat of passion,[3] voluntary manslaughter committed in the unreasonable belief that killing was justifiable,[4] and involuntary manslaughter.[5] The jury which heard the evidence found Harner guilty of voluntary manslaughter in the unreasonable belief that the killing was justifiable.[6] Post-trial motions were denied, and Harner was sentenced to serve a term of imprisonment for not less than five years nor more than ten years. On direct appeal, Harner contends that the evidence was insufficient to sustain the jury's verdict, that the trial court committed error in several evidentiary rulings, and that trial counsel rendered ineffective assistance. We find no merit in these arguments and affirm the judgment of sentence.

■ Appellant's principal argument is that there was no evidence that he had killed Rice in the unreasonable belief that killing was justified. The Commonwealth agrees that there was no such evidence but argues that there was sufficient evidence to show murder of the first or third degree and that the jury's verdict, therefore, was proper as an exercise of its mercy dispensing power. Appellant counters that recent decisions of the Supreme Court have deprived juries in homicide cases of any mercy dispensing power. He argues that in the absence of evidence to

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 2502(c).
3. 18 Pa.C.S. § 2503(a).
4. 18 Pa.C.S. § 2503(b).
5. 18 Pa.C.S. § 2504.
6. This offense is defined at 18 Pa.C.S. § 2503(b) as follows:
    **(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

support the jury's verdict he is entitled to be discharged. We reject this argument.

The law in this Commonwealth has always been that a conviction for voluntary manslaughter will be upheld as long as the evidence is sufficient to show that the elements of murder were present. Thus, in *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A.2d 726 (1970), the Supreme Court said:

> Few propositions are better established in the criminal law than the doctrine that where the evidence would be sufficient to support a conviction of murder, the return of a verdict of voluntary manslaughter is strictly within the jury's prerogative even in the absence of provocation and passion.
>
> . . . .
>
> As the cases enunciating the doctrine make clear, all that is required before a conviction of voluntary manslaughter in the absence of passion and provocation will be allowed to stand is that the evidence be such that the jury could have found present every element of murder.
>
> . . . .
>
> In short, the rationale of the doctrine under discussion is found in a combination of two factors: a realistic appreciation of the humanity of those who sit on our juries, and the legal concept that voluntary manslaughter is by definition a lesser offense than murder but one included within a murder indictment.

*Id.*, 439 Pa. at 356–359, 266 A.2d at 731–732. See also: *Commonwealth v. Whitfield*, 474 Pa. 27, 376 A.2d 617 (1977); *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142, *cert. denied*, 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974); *Commonwealth v. Hill*, 444 Pa. 323, 281 A.2d 859 (1971); *Commonwealth v. Frazier*, 420 Pa. 209, 216 A.2d 337 (1966). There is no reason why the rule should be different when voluntary manslaughter occurs because there is an unreasonable belief that killing is justified.

In *Commonwealth v. Manning*, 477 Pa. 495, 384 A.2d 1197 (1978), the Supreme Court held that a defendant in a murder trial was entitled, upon request, to an instruction on unreasonable belief voluntary manslaughter. This rule, however, was short-lived. In *Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328 (1983), the Supreme Court overruled *Manning* and held that a defendant was entitled to an unreasonable belief voluntary manslaughter charge only upon request "where the offense has been made an issue in the case, and the trial evidence reasonably would support such a verdict." *Id.*, 502 Pa. at 443, 466 A.2d at 1332–1333 (footnote omitted). The Court reasoned:

> Simply because unreasonable belief voluntary manslaughter sometimes may arguably be a lesser-included offense of murder is not a valid reason upon which to base a requirement that a trial judge must instruct a jury on an offense extraneous to the proof at trial. Such requirement only serves to confuse juries and invite them to base their verdicts on whim and caprice. Whatever the merits, or current vitality of the theory that due process requires an instruction on common law voluntary manslaughter in every murder case, we see no reason to extend that theory to require instruction on imperfect self-defense where there is no evidence to support it. Further, invitations to jury confusion or irrationality are unnecessary. Such invitations would be offered here if the jury had been instructed on "unreasonable belief" voluntary manslaughter when the proof at trial did not rationally support a verdict on it.

*Commonwealth v. Carter, supra*, 502 Pa. at 442–443, 466 A.2d at 1332 (footnote omitted).

Appellant argues that with its decision in *Carter*, the Supreme Court overruled the line of cases holding that a jury has a mercy dispensing power which allows it to reduce a proven murder to voluntary manslaughter. It follows, he suggests, that a conviction for unreasonable belief voluntary manslaughter which is unsupported by the evidence

cannot be sustained by evidence of murder. We do not so interpret *Carter*.

In the instant case, the prosecuting attorney had specifically charged appellant, inter alia, with "unreasonable belief" voluntary manslaughter. At trial, after all evidence had been received, the trial court inquired of both counsel whether any charges were to be withdrawn. Defense counsel took the position, as he had done earlier in the trial, that the charge of "unreasonable belief" voluntary manslaughter should not be withdrawn and that the jury should be instructed thereon. Consequently, the jurors were so instructed. They were told that guilty of "unreasonable belief" voluntary manslaughter was a possible verdict which they could return. Appellant cannot complain that the trial court instructed the jury as requested or that the jury returned a verdict which, according to the court's instructions, was a permissible verdict.

The decision in *Carter* does not require a different result. That decision held only that a defendant is not entitled to an instruction on "unreasonable belief" voluntary manslaughter unless such a verdict would find support in the evidence. In the instant case, however, appellant had been charged specifically with "unreasonable belief" voluntary manslaughter, did not want the charge withdrawn, and requested the trial court to instruct the jury thereon. *Carter* did not hold, at least under these circumstances, that a jury could not return a verdict finding the defendant guilty of voluntary manslaughter so long as the evidence was such that the jury could have found the defendant guilty of murder. If the elements of murder were present, a verdict of guilty of voluntary manslaughter was neither arbitrary nor unsupported. See: *Commonwealth v. Hill, supra,* 444 Pa. at 326, 281 A.2d at 860.

Therefore, we must examine the evidence to determine whether it was sufficient to support a finding of murder. In making this examination, we determine whether, "viewing all of the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable

to the Commonwealth, the trier of fact could have found that each element of the offense[ ] [of murder] was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Jackson*, 506 Pa. 469, 472–473, 485 A.2d 1102, 1103 (1984). Moreover, "[w]hen conflicts and discrepancies arise, it is within the province of the jury to determine the weight to be given each testimony and to believe all, part, or none of the evidence as [it] deem[s] appropriate." *Commonwealth v. Verdekal*, 351 Pa.Super. 412, 419–420, 506 A.2d 415, 419 (1986).

When Rice's body was found, police conducted an upstream search on the theory that the body may have been carried downstream during the winter. In a shed on land adjoining the Harner residence, where appellant was shown to have played, police found a white garbage bag containing bloodstained clothing. A similar bag, sans clothing, was later found in the trunk of a Harner vehicle. Analysis of the bloodstains on the clothing established that the blood was human and had come from a type A secreter. Rice had been a blood type A secreter. Hair found on the clothing was similar to hair samples taken from appellant. Partially concealing the clothing had been a cardboard box which, by virtue of its markings, was traced to the Harner residence, where it had served as a container for Mustang automobile parts. The cardboard box contained bulletholes, and there was evidence that it had been used for target practice by members of the Harner family prior to Rice's disappearance. Although the clothing could not be specifically traced to Harner, the trousers were shown to be the same size, style, and lot number as other trousers worn by appellant. There was also testimony that the shirt was similar to a shirt which had been worn by appellant.

Rice's death had been caused by a gunshot wound to the head. The bullet had been fired from a Colt .22 caliber revolver registered to Harner's father. This gun was available to Greg Harner. Indeed, appellant, himself, conceded that he had had the gun in his car several days before

Rice's disappearance. Ballistic tests demonstrated unequivocally that the revolver had been the murder weapon.

On November 20, 1985, Rice's wallet had been found in a trash receptacle in an area where appellant regularly attended class.

Appellant had been the last person to see Rice alive. After school on the day of his disappearance, Rice had been a passenger in appellant's car. Appellant's initial version of the incident was that he and Rice had been followed by another car, which had pulled in behind him when Harner left Rice at a Honda shop.

Shortly before trial, appellant gave the representatives of the Commonwealth a different statement. In this statement he said that he had loaned his father's gun to a friend who wanted to teach Rice a lesson. He also said that he had been present when Rice was killed. On the farm where Rice's body was subsequently discovered, he had observed Rice, naked on the ground, being punished by a group of persons for being a "snitch." A member of the group, whom appellant identified, had allegedly shot Rice in the back of the head, had castrated him on the left side, and had thrown a bag containing clothing and the gun at appellant's feet. Appellant had retrieved the gun and discarded the bag of clothing. He had not gone to the police, he said, because he didn't think they would believe his story. When Rice's body was found, the left side of his body was so badly deteriorated that appellant's description of partial castration could not be verified or contradicted. Other parts of appellant's version, however, were rebutted by Commonwealth witnesses.

The Commonwealth's evidence, although circumstantial, was sufficient to support a finding that Rice had been murdered by appellant. The Commonwealth's evidence, if believed, showed that Rice had been killed by a bullet to the back of the head, which had been fired from appellant's gun, at a place and under circumstances with which appellant had been familiar. The evidence of appellant's conduct thereafter was sufficient to permit an inference of guilty

knowledge on the part of appellant. Because the evidence was sufficient to support a finding that Rice had been murdered by appellant, the trial court properly refused to arrest judgment on the jury's verdict finding appellant guilty of voluntary manslaughter.

■ We reject appellant's ; contention that trial counsel was ineffective for allowing the "unreasonable belief" voluntary manslaughter charge to be given to the jury. This was a matter of trial strategy, and was designed to serve appellant's interests by establishing a "safety net." In view of our finding that sufficient evidence was presented to convict appellant of murder, trial counsel was not ineffective when he asked the trial court to instruct the jury regarding a possible finding that appellant had committed the lesser offense of voluntary manslaughter.

■ Appellant contends that the trial court erred by allowing the bloodstained clothing to be received in evidence. Prior to the start of trial, appellant made an oral motion in limine to exclude the clothing. The following occurred:

THE COURT: What about the in limine motion? Do you want to make what would amount to an offer?

MR. HARTMAN [The District Attorney]: I'll make an offer, Your Honor. Commonwealth would indicate that first of all the items of clothing are blood stained and that the criminologist called I believe would be Donald Bloser, criminologist, who will indicate that the blood on the clothing was type A. It is anticipated at trial that there will be stipulations about some of this but if necessary Dr. Kaguyutan would indicate that the defendant's blood is type A and Donald Bloser would testify that the decedent's blood was type A because he was a type A secreter.

Further the search that produced the clothing then moved onto a search of the premises. There was a consensual search of Greg Harner's personal clothing closet and Trooper Ackerman if called would testify that in that closet he—I am sorry I stand corrected. There was a warrant obtained for that search of the closet. It

was a warrant obtained and in searching Greg Harner's closet there were jeans that were the same size as the two pair of jeans that were in the bag.

Now keep in mind that the evidence would show that the bag contained one pair of jeans size 29 by 34 and one pair of jeans size 31 by 34. Ackerman would testify that in Greg Harner's closet there were jeans 29 by 34 and 31 by 34. More importantly there was one pair of jeans in the bag that was the exact same make, style and lot number as a pair of pants hanging in Greg Harner's closet.

Further that the type shirt is a plaid long sleeve, western style flannel shirt with pearl snaps and that there were more than one such plaid western style, long sleeve, flannel shirts hanging in Greg Harner's closet with pearl snaps.

The evidence would also develop that if called the officials for United Parcel Service would indicate that the piece of cardboard that Mr. Haynes had described wedged between the bag and the flooring of the structure was in fact cardboard boxing that had been ordered by Greg Harner delivered to and signed for by Carol Harner containing an auto part for a Mustang. That there was a smear of blood on the cardboard which also proved positive for type A blood.

When questioned about these matters Greg Harner indicated that he had never hurt himself seriously in the area of this structure except once when he cut his finger and it bled moderately and that he had personally never shot any target in that area with any cardboard. He also personally admitted that the boxing material or cardboard material had been ordered by him and did contain a Mustang Ford product part. That would be our offer, Your Honor.

THE COURT: All right, Mr. Gerber.

MR. GERBER [Defense counsel]: With respect to the clothing, I think that the fact is that it was also the size of the deceased Craig Rice, that the jeans in question are

the kind of jeans that can be bought at any store any time, that the shirt is equally common, so are the white socks, that a lot of people have type A blood and that when you look at the trousers, and we have got photographs of the pictures of the trousers, that it is our position that the probative value of introducing this clothing into evidence is far outweighed by the prejudice that it could cause to the Defendant.

THE COURT: What is the prejudice? You're not arguing that this is inflammatory?

MR. GERBER: I certainly am. When you look at the trousers, Judge Spicer—

THE COURT: Perhaps I ought to see the trousers. There's a different test of admissibility with inflammatory material than with ordinary evidence. So what's inflammatory about the trousers?

MR. GERBER: Judge, I respect there is a different test. I am responding simply by saying that, number one, the trousers involved, although the size of Greg Harner, which isn't denied, they are also the size of Craig Rice and may be a multitude of other people that age when you look at a 29 by 34, 31 by 34 blue jeans. The mere fact that my client wore that size and the mere fact that the deceased wore that size in no way means that they are our client's clothing, and I think it's a pretty difficult leap to put those pants in my client's closet just because they were found out on the Gebhart property.

Secondly, with regard to the shirt, although the shirt may be like shirts that my client has, they can't say that that shirt is my clients [sic] and it's a very common shirt that's sold in all forms of clothing stores everywhere. The white socks the same way. Without going into the inflammatory issue, I respectfully submit that the commonality of the clothing and the fact that both boys have type A blood is such that this evidence with regard I am talking to the shirt and the trousers and the socks should be held inadmissible.

THE COURT: I think it important to distinguish between admissibility and sufficiency. Certainly these things are admissible and I so rule. Let's take a ten minute recess.

" 'Evidence is relevant if it tends to make more or less probable the existence of some fact material to the case, it tends to establish facts in issue or when it in some degree advances the inquiry and thus has probative value.' " *Commonwealth v. Delligatti*, 371 Pa.Super. 315, 332, 538 A.2d 34, 42 (1988), quoting *Commonwealth v. Shain*, 324 Pa.Super. 456, 462–463, 471 A.2d 1246, 1249 (1984). "[I]t is not necessary that each piece of evidence be connected to the appellant beyond a reasonable doubt. It is enough that a combination of evidence implicates him in the crime beyond a reasonable doubt." *Commonwealth v. Mangus*, 229 Pa. Super. 29, 33, 323 A.2d 398, 400 (1974). See also: *Commonwealth v. McIntyre*, 451 Pa. 42, 301 A.2d 832 (1973); *Commonwealth v. Petrisko*, 442 Pa. 575, 275 A.2d 46 (1971).

The bloodstained clothing in this case was found in a shed, which appellant was known to frequent, located in close proximity to land owned by appellant's parents. It was partially covered by part of a cardboard box which had contained an automobile part previously delivered to appellant. The clothing was appellant's size and was similar to other clothing which he owned. The bloodstains had been made by blood of the same type as that of the decedent. Under these circumstances the clothing was a relevant fact to be considered by the jury. The fact that the clothing could not be traced directly to appellant (or the decedent) was a factor to be considered by the jury in determining the weight to be accorded the evidence, but it did not render the evidence inadmissible. See: *Commonwealth v. Costanzo*, 269 Pa.Super. 413, 418–419, 410 A.2d 324, 326 (1979). See also: *Commonwealth v. Ford*, 451 Pa. 81, 301 A.2d 856 (1973); *Commonwealth v. Simpson*, 302 Pa.Super. 287, 448 A.2d 640 (1982); *Commonwealth v. Mangus, supra.* The

242

trial court did not err when it allowed the jury to consider the evidence.

■ Appellant's argument that Michael Cooper's testimony was improper because it permitted an inference of homosexuality is simply not warranted. Its role was described by the trial court as follows:

Certainly, the bench discussion about [Cooper's] testimony concerned homosexuality. The jury did not hear the discussion. The testimony fell far short of suggesting anything improper. One young man removed cockles or burrs (called "chiggers" by the witness) from running shorts of another. The reason was explained. Defendant did not want the cockles or burrs in his car.

Commonwealth was precluded from arguing sexual innuendoes.

Perhaps the testimony was worthless. It did not conform to the offer. However, its affect [sic], if any, was negligible. It was only one more detail in a veritable surfeit of facts.

(Trial Court Opinion at p. 14). If Cooper's testimony was irrelevant, it was also so insignificant as to be harmless.

The testimony of Phillip Hill, which appellant now contends was irrelevant, was not the subject of a defense objection at trial. This issue, therefore, has been waived. See: *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Kuterbach*, 458 Pa. 318, 326 A.2d 283 (1974); *Commonwealth v. White*, 366 Pa.Super. 538, 531 A.2d 806 (1987).

■ Appellant's final version of Rice's mishap was communicated to defense counsel shortly before trial. Defense counsel thereafter communicated this information to the police and allowed appellant to be questioned by the police. Appellant, represented post-trial by new counsel, argues that his trial counsel rendered ineffective assistance by communicating his defense to the police and by permitting the police to interrogate appellant with respect thereto.

The trial court disagreed and concluded that trial counsel had not been constitutionally ineffective.

In evaluating claims of ineffective assistance of counsel we utilize the following approach:

Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant. *Commonwealth v. Floyd*, 506 Pa. 85, 90, 484 A.2d 365, 367 (1984); *Commonwealth v. McKendrick*, 356 Pa.Super. 64, 71, 514 A.2d 144, 148 (1986), *allo. denied*, 514 Pa. 629, 522 A.2d 558 (1987). To meet that burden, appellant must demonstrate that 1) the issue underlying his claim of ineffectiveness is of arguable merit; 2) the course chosen by counsel had no reasonable basis designed to serve his interests; and 3) he suffered prejudice as a result of counsel's ineffectiveness. *Commonwelth v. Pierce*, 515 Pa. 153, [158–160], 527 A.2d 973, 975–76 (1987); *Commonwealth v. Buehl*, 510 Pa. 363, 378–79, 508 A.2d 1167, 1174–75 (1986); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604–5 & n. 8, 235 A.2d 349, 352–53 & n. 8 (1967).

*Commonwealth v. House*, 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). Moreover,

"[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight

evaluation of the record. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 604, 235 A.2d 349 (1967). *Commonwealth v. Dunbar,* 503 Pa. 590, 596, 470 A.2d 74, 77 (1983). See also: *Commonwealth v. Garcia,* 370 Pa.Super. 132, 535 A.2d 1186 (1988); *Commonwealth v. Nauman,* 345 Pa.Super. 457, 498 A.2d 913 (1985).

At a post-trial hearing, appellant's trial counsel explained his reasons for allowing appellant to be questioned by police as follows:

At that time I made a decision that with a trial date two weeks away, that I had to come to the Commonwealth for two purposes. One, to get that trial date postponed so that an investigation could commence with regard to what Gregory said. The second decision I had to make was how to come to the Commonwealth with the information.

I had three options. One, I could come in and make it to you and make a proffer as to what was said. By a proffer I mean simply sum up what I knew. Two, I could present to you a written statement. Three, I could present Gregory Harner. In a discussion with Gregory's parents and it was my decision, I thought we should present Gregory Harner because Gregory Harner had made certain statements to Sergeant Straka and other police officers in the autumn of 1985. He made other statements to the police officers, Trooper Zeisloft, Officer Sease and others, in the spring of 1986 after Craig Rice's body was found.

I had a decision to make as to whether or not I was not going to tell the Commonwealth anything and spring this statement as a surprise somewhere after January 12th of 1987 at trial. It was my opinion that a surprise statement at trial was subject to cross examination by you with regard to the autumn 1985 statements, the spring of 1986 statements and in my judgment I didn't think that any jury was going to believe it and what we had to do was to come forward at the outset. Gregory Harner now free of the fear because the story was on the street,

should come forward and boldly say go get the people who really did it. And that Gregory Harner should come in and demonstrate, as he did, that he wasn't afraid to tell the truth. That was exactly what the plan was and [ ] that was my judgment on the 29th and again when I reviewed it with Gregory on the 31st and when I reviewed it on the phone.

The trial judge, who heard the testimony and observed counsel, assessed defense counsel's strategy as follows:

Counsel's strategy was obvious and we have to agree with trial counsel's appraisal, voiced at the November 10, 1987, hearing, that it was successful. Not only did he create the impression that others were on trial, he appeared to zealously endeavor to expose the truth. Defendant complains that trial counsel was "tough" and assumed a prosecutorial stance. Trial counsel unswervingly has evidenced loyalty to his client, even after being accused of incompetence. Trial counsel's strategy, at the very least, confused issues of responsibility and shifted sympathy away from the victim to Defendant, explained prior inconsistencies and reticence to divulge the truth. As the jury saw one prosecution witness after another compare unfavorably in appearance and background with Defendant and his family, sympathy obviously mounted for Defendant. The charges became enmeshed in murky stories of drugs, sodomy, and conspiracy. Trial counsel appeared, at times, to assume a prosecutorial role only to expose the "real" culprits.

A time honored defense strategy is to try anyone but the Defendant. As sympathetic as one might be to those whose reputations may have been tarnished forever, one also must acknowledge, that trial counsel's strategy was both brilliantly conceived and exploited.

Thus we emphatically reject any argument that trial counsel was ineffective.

We have no reason to disagree with the trial court's assessment of defense counsel's strategy. That strategy was carefully calculated to minimize the effect of appel-

lant's earlier statements and his delay in coming forward promptly with the version on which he based his defense. By announcing that defense prior to trial and by thereby implicating others, appellant's counsel was able to move to the offensive and focus attention on other potential killers. The strength thereof was enhanced by the fact that he had submitted to interrogation by the police. This strategy, being reasonably calculated to serve appellant's interest, did not render counsel constitutionally ineffective.

The judgment of sentence is affirmed.