Commonwealth *v.* LaPorta, Appellant.

2

Argued April 13, 1970.   Before Wright, P. J., Watkins, Montgomery, Jacobs, Hoffman, Spaulding, and Cercone, JJ.

*F. Lee Bailey* of the Massachusetts Bar, with him *Caram J. Abood,* and *Green, Gibson & Abood,* for appellant.

*Marvin L. Wilenzik,* Assistant District Attorney, with him *Ferdinand F. Bionaz,* District Attorney, for Commonwealth, appellee.

Opinion by Watkins, J., September 18, 1970:

This is an appeal by the defendant-appellant, Charles LaPorta, Jr., from the judgment of sentence by the Court of Common Pleas of Cambria County, after

conviction of involuntary manslaughter; and from the denial of post-trial motions in arrest of judgment and for a new trial.

Charles LaPorta, Jr. is a member of the police force of the City of Johnstown. He had been on the force for fourteen months at the time of the incident. He is 27 years of age, married, with two children. The police force had been ordered to break up gangs of young men gathering at night in the area where this incident occurred because of complaints by citizens of teenage drinking, carousing, looting and purse snatching. They were ordered to break up any group of two or more boys "hanging around" the area.

At 9 p.m., March 29, 1969, Officer Thomas A. Ricci of the Johnstown police force was patroling in the area. He heard a group singing and making noise in the rear of the Arrow Furniture Company in an alley known as Bausman Place. He estimated the number of carousers to be three or four young men standing on a loading platform or ramp in the said alley.

He had been advised not to attempt to break it up by himself and he called headquarters for help. Headquarters dispatched the defendant in a police car to assist Ricci. The two officers proceeded slowly in the car with headlights extinguished so as not to alert the culprits. When they arrived at the ramp, the car was parked in such a way as to prevent easy escape from the ramp. The ramp was 2½ feet above the alley.

When they arrived and got out of the car they found, instead of three or four youths, twelve young men towering over them. They were drinking and had two gallons of wine in their possession. Some of the boys were drinking from the bottles at the time the police arrived.

Both officers got out of the car and when the defendant realized the number and size of those confront-

ing them, he reached in the car and turned on the lights. He drew his gun and held it pointing downward at his side as a defensive precaution. The defendant was actually between the ramp and the car. As they approached the ramp someone shouted "Here comes the fuzz" and another said "Don't run." The defendant told them to stop, that they were under arrest. They began jumping from the ramp, pushing and shoving the defendant as they ran down the alley. The last to jump was the decedent, Timothy Perkins, 16 years old, 6′ 2″ tall and weighing 190 pounds. The defendant was 5′ 8″ and weighed 165 pounds. All the youths towered over the defendant at the time of the confrontation and resistance at the ramp.

As Perkins jumped, the defendant grabbed his coat with his left hand and tried to apprehend him. They were running down the alley a step apart and all the time the defendant had hold of the coat with his left hand and his gun in the right hand. It is important to realize that the action that ended in the unfortunate death of the young man took place in a much shorter time than it takes in the telling and description. The defendant testified that everything happened so fast and his hands were so confined by trying to apprehend Perkins that he did not have the opportunity to restore the gun to the holster.

According to the testimony of the Commonwealth as well as the defendant, the action took place with the defendant holding onto the fleeing boy's coat and the boy elbowing at him trying to get away. The defendant was finally able to turn him around at one point and declare him under arrest when he struck at him knocking off his cap and kicking him in the shin bone. The run down the alley continued until they were approximately forty-seven feet from the ramp when the revolver went off, killing Perkins.

The bullet entered the back of his head and proceeded in an upward projectory. The Commonwealth testimony disclosed that the defendant told Ricci that the revolver "accidentally went off" and assumed that the flailing elbow's striking his arm was responsible. The gun was not cocked and it would take ten pounds of pressure to discharge it. The defendant could not recall, but assumed his finger was on the trigger.

The defendant was indicted for voluntary and involuntary manslaughter. A demurrer to the charge of voluntary manslaughter was denied and the jury was charged as to both. After deliberating for 5½ hours, the jury asked whether they could find the defendant guilty of involuntary manslaughter with a recommendation of leniency. The court answered in the affirmative without any explanation. The defendant was found guilty of involuntary manslaughter with leniency recommended. The District Attorney joined with defense counsel in requesting probation. The court sentenced the defendant to 3 to 23 months in the County Prison. Post-trial motions were denied by the court en banc, two to one. This appeal followed.

The defendant's contentions can be summarized as follows:

(1) The evidence was insufficient to support the verdict of guilty of involuntary manslaughter. (2) The verdict of involuntary manslaughter was a compromise verdict brought about by the failure of the court below to sustain the defendant's demurrer to the charge of voluntary manslaughter and the submission of this charge to the jury so prejudiced the fairness of the defendant's trial as to amount to reversible error and entitle him to a new trial.

Involuntary manslaughter consists of " '[t]he killing of another without malice and unintentionally, but in (1) doing some unlawful act not amounting to a felony

6

nor naturally tending to cause death or great bodily harm, (2) or in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty.' " *Commonwealth v. Mayberry*, 290 Pa. 195, 138 A. 686 (1927).

The question before us is whether there was sufficient competent evidence to hold a police officer guilty of involuntary manslaughter in attempting to make an arrest with weapon drawn but not pointed when the weapon discharged accidentally killing the suspect who was resisting arrest and assaulting the officer. We think not.

It is necessary in considering the appeal of the police officer to begin with the reasons for his appearance in the alley where the trouble took place. His state of mind at that time is of the greatest importance in this appeal. We begin, then, with the directive by his superiors to break up gangs of young men composed of more than two "hanging around" the alley. This directive was the result of citizen complaints of noise, carousing, drinking and looting and other violations of the law that took place in the area. It is a present problem confronting cities large and small.

The defendant was dispatched to help another officer carry out the directive. The duty of the officers was clearly to break up these gatherings and take into custody those violating the law. The law was being violated by these young men in the presence of the officers by their drinking and the creation of a public nuisance. The decedent was violating the law in resisting arrest and assaulting the officer at the time of the discharge of the weapon. Two gallons of wine were in the possession of the boys and they also refused to stop when ordered by the police and they all, including the decedent, resisted arrest in shoving and pushing the defendant to make their escape after being told they

were under arrest. All were successful in resisting arrest and fleeing except the decedent who continued to resist by striking, kicking and elbowing the defendant so that in the struggle his gun was fired.

The background explains the surreptitious approach of the officers with the lights out. The state of mind of the gang of boys is shown by the shout of "Here comes the fuzz" and as they leaped from the ramp shouting "Get out of my road" and "Move out of the way." The crux of the case is the surprise of the defendant and Ricci being confronted by twelve young men towering over them instead of three. The defendant recognized some of them as law violators. One had been convicted of assault on a police officer. Both officers were apprehensive of the situation so that the drawing of the gun and holding it at his side was a reasonable precaution. It should be remembered too that the defendant bore the brunt of the pushing and shoving that led to the escape of all but one of the group.

There was no testimony that the weapon was ever pointed at anyone. In fact, the Commonwealth agreed that there was no intention to kill. Officer Ricci testified that the defendant said immediately after the discharge of the gun that it "accidentally went off."

The revolver was drawn by the defendant under apprehension when confronted by the twelve youths. It was testified to by the Commonwealth that the twelve youths were drinking and standing shoulder to shoulder on a ramp $2\frac{1}{2}$ feet over the alley where the defendant was standing. The revolver, which was seen by the suspects, may well have prevented serious bodily harm to the officers. Ricci testified that shouts were made to the defendant "Move out of the way.", "Get out of my road." before the pushing and shoving. He further testified as follows: "because I seen LaPorta trying to

make an arrest and we were badly outnumbered. If they would have turned around and come back, it would have been a hopeless case." He then went to the car to radio for help.

The court below put great emphasis on *Commonwealth v. Loughhead,* 218 Pa. 429, 67 A. 747 (1907), where a prisoner after actual capture and custody for a misdemeanor attempted to escape and while escaping was shot dead by the constable, and it was found that the killing was not justified. The constable may be convicted of voluntary manslaughter. This was the intentional killing by an officer of an escaping suspect of the commission of a misdemeanor. While in the case of misdemeanor, an officer is never required to retreat and may meet force with force, he cannot justifiably take the life of a person who is fleeing from arrest or one who has been arrested and has escaped from custody and is fleeing from him. In *Loughhead,* there was no causation problem.

In the instant case, the Commonwealth does not contend that the defendant shot the decedent while fleeing from him. It admits that the gun was not fired intentionally and the suspect had never been in custody and the struggle was the attempt of the officer to put him in custody. We agree with Judge Smorto of the court en banc, who dissented: "The Commonwealth would seem to expect that an officer of the law suddenly confronted by twelve rather than three persons in an alley at night should instantaneously determine that no felony had been committed and, therefore, should not draw a protective weapon in making his approach. In this day and age, we believe that this is asking and expecting too much even from an officer of the law. We are troubled by the danger that lurks upon our streets. We are concerned with the disrespect for law and order that has been so dramatically demonstrated within the

walls of our most revered educational institutions and within the shadow of our convention halls. . . In this case, we believe that the jury should have been instructed as a matter of law that the accused officer did have the right to draw his gun as he approached this group."

Where the act itself is not unlawful, that is contrary to law, then to make it criminal, "the negligence must be such a departure from what would be the conduct of an ordinary, prudent or careful man under the same circumstances as to evidence a disregard of human life or an indifference to consequences." *Commonwealth v. Aurick*, 342 Pa. 282, 288-89, 19 A. 2d 920 (1941). The court in *Aurick* further said at page 285, that the recklessness of conduct causing death must amount to unlawfulness. And at page 289, the court stated that it is clear that a more culpable degree of recklessness is required to establish criminal homicide than is necessary in tort.

Recklessness means a certain state of consciousness with reference to the consequences of one's acts and it depends on the actual condition of the defendant's mind with regard to consequences. *Commonwealth v. Balanzo*, 261 Pa. 507, 104 A. 683 (1918).

In the *Aurick* case, where the Court said: "conduct of an ordinary, prudent or careful man" we should substitute "the conduct of the ordinary, prudent policeman" sworn to protect society from law breakers in the performance of his duty.

An essential and separate element of the crime of involuntary manslaughter is that the unlawful or reckless conduct charged to the defendant was the direct cause of the death. *Commonwealth v. Root*, 403 Pa. 571, 170 A. 2d 310 (1961). The *Root* case involved an automobile race on a public highway. One of the drivers swerved to the left of the road and crashed head-on into an oncoming truck and was killed. The

court held at pp. 578-80: "[T]he conduct of the deceased victim must be considered in order to determine whether the defendant's reckless acts were the proximate (i.e., sufficiently direct) cause of his death. . . [T]he tort liability concept of proximate cause has no proper place in prosecutions for criminal homicide and more direct causal connection is required for conviction." Root clearly distinguished Commonwealth v. Levin, 184 Pa. Superior Ct. 436, 135 A. 2d 764 (1957), which was also a racing case where the defendant cut his automobile from the left lane ahead of decedent's car in the right lane and caused the crash. Here there was proof that the defendant was the direct cause of the death.

In the instant case, where the burden is on the Commonwealth to prove its case beyond a reasonable doubt, no proof or theory is set forth by the Commonwealth as to why the revolver was fired. Only two inferences can be drawn. One, defendant voluntarily and intentionally shot the victim or, two, the weapon was fired while the defendant was struggling with the suspect in an attempt to place him under arrest. The first inference is entirely unreasonable because there is no proof that the weapon was aimed and the Commonwealth agrees it was not an intentional shooting. There is evidence that the suspect knew the defendant had a revolver in his hand so that it must be concluded that at some point in the struggle the jarring and elbowing caused the discharge.

So the question recurs under Root whether the conduct of the decedent was a supervening cause or whether the evidence is insufficient to prove more than an accidental death. Commonwealth v. Redline, 391 Pa. 486, 137 A. 2d 472 (1958). In Commonwealth v. Clowser, 212 Pa. Superior Ct. 208, 239 A. 2d 870 (1968), the court stated that the conduct of the decedent must

be considered in involuntary manslaughter cases with a view to determine the actual cause of death and that the deceased's conduct may diminish the responsibility as to the legal cause of the death so as to preclude a finding that the defendant's recklessness made him guilty of involuntary manslaughter. In the instant case, to hold the defendant culpable for the fired shot is to alleviate the need for proof beyond a reasonable doubt of death causation as set forth in *Root, Redline,* and *Clowser.* See also, *Commonwealth v. Hartle,* 200 Pa. Superior Ct. 318, 188 A. 2d 798 (1963).

As the Supreme Court said in *Commonwealth v. Feinberg,* 433 Pa. 558, 253 A. 2d 636 (1969), at page 566: "The conduct of the defendant resulting in the death must be such a departure from the behavior of an ordinary and prudent man as to evidence a disregard of human life or an indifference to the consequences. . . Furthermore, there must be a direct causal relationship between the defendant's act and deceased's death." Again, we should substitute "ordinary and prudent police officer performing his duty."

The Commonwealth contends that all prudent men in all situations must act in the same manner. The defendant was one man facing a crowd of larger, potentially dangerous men with orders to carry out to protect society. As testified by Ricci, if the men turned on them the situation would have been hopeless. The gravity of the situation at the time and its unpredictability clearly establishes just cause for the withdrawing of the weapon. Any other conclusion would be a proclamation that police officers should not be allowed to withdraw their weapons until it is too late. We do not believe that the defendant in the instant case was under any duty to retreat and that his failure to do so was at worst an error in judgment and did not constitute criminal recklessness.

Although our cases do not go so far nor do they need to in the instant case, there is merit in *New Jersey v. Williams*, 29 N.J. 27, 148 A. 2d 22 (1959), where it was held: "Where, however, an offender offers physical resistance to arrest or to the maintenance of custody, the officer need not retreat, but on the contrary may become the aggressor and use such force as is necessary to overcome the resistance. If such force unavoidably results in the death of the offender, the homicide is justified."

It is important to note that at the time of the struggle, the decedent was clearly resisting arrest and violating The Penal Code of 1939, as amended, 1963, July 11, P. L. 234, §1, 18 P.S. 4314 (Supp. 1970), which provides: "Whoever knowingly, wilfully and forcibly obstructs, resists or opposes any officer . . . making a lawful arrest without warrant, or assaults or beats any officer . . . making a lawful arrest without warrant . . . is guilty of a misdemeanor. . ."

The facts and circumstances contained in this record are insufficient to support the verdict of involuntary manslaughter. The court below erred in refusing to charge that "under all the facts and circumstances, your verdict should be not guilty of involuntary manslaughter."

It is unnecessary, therefore, to discuss the contention of the defendant that the failure of the court below to sustain the demurrer as to voluntary manslaughter and its submission to the jury, compounded by the sanction by the court to permit the jury to recommend leniency, without explanation (*Commonwealth v. Mills*, 350 Pa. 478, 39 A. 2d 572 (1944)), was an invitation to a compromise verdict to the prejudice of a fair trial to the defendant, and reversible error.

The judgment of sentence is reversed and the defendant discharged.

HOFFMAN, J., would grant a new trial.