Commonwealth, Appellant, *v.* Kominsky.

Argued June 12, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Stephen B. Harris*, First Assistant District Attorney, with him *Kenneth G. Biehn*, District Attorney, for Commonwealth, appellant.

*S. Richard Klinges, III*, and *Begley, Carlin, Mandio, Kelton & Popkin*, submitted a brief for appellee.

OPINION BY WATKINS, P.J., June 28, 1976:

This is an appeal by the Commonwealth from the order of the Court of Common Pleas of Bucks County,

Criminal Division, granting the motion of the defendant-appellee for an arrest of judgment after conviction by a jury of involuntary manslaughter.

On December 1, 1970, the appellee, Dr. Solomon Kominsky, was arrested and charged with involuntary manslaughter. The appellee was tried before a Bucks County jury and on October 30, 1973, the jury returned a verdict of guilty. Post verdict motions for a new trial and in arrest of judgment were filed and argued. The court in an opinion by MOUNTENAY, J., granted the appellee's motion in arrest of judgment. From that holding the Commonwealth appealed to this Court.

The evidence reveals that the appellee, an osteopathic physician, residing with his wife and family, had engaged in a meretricious relationship with Judy Moore, the victim, over some period of time. However, shortly before the incident in question, the appellee had unilaterally terminated the relationship.

On the evening prior to the decedent's death, she met with the appellee at about 11:00 P.M., following which the decedent and the appellee went to the Patio Restaurant for dinner. Previous to this meeting the decedent had been searching for employment and a domicile in Virginia. The decedent appeared to the appellee to be in a good mood although she had admitted having a couple of drinks on her way up from Virginia. The couple ate dinner and the decedent had two drinks at the restaurant from which they departed at approximately 1:00 A.M. or 1:30 A.M. The appellee took the deceased back to her automobile which was parked at the doctor's office. The appellee went home and retired and assumed the deceased did the same thing; however, the evidence does not disclose what the deceased did at this time.

At approximately 5:00 A.M. that same day the deceased called the appellee at his residence. The appellee perceived over the telephone that the deceased was intoxicated and quite upset and she stated that she wanted to see him. The appellee asked the decedent to

meet him at his office which she did. When he arrived at the office the decedent appeared to be visibly intoxicated and the appellee asked her to remain in the office and he said he would go to the Five Points Diner to get her some food. When Dr. Kominsky arrived at the diner the decedent unexpectedly pulled up behind him. He went into the diner and ordered a tuna fish sandwich and coffee for the decedent. She consumed one half of the sandwich and drank some of the coffee. After this the appellee insisted he drive the decedent home in her car because she appeared too intoxicated to operate her own vehicle. The appellee drove the decedent to a farm owned by the appellee where the decedent and her five children resided and operated a horse farm with riding stables. Apparently it was not unusual for the decedent to come home intoxicated and she would occasionally park her car in an orchard across the road from the farmhouse. On the instant occasion the record indicates that the decedent did not want her children to see her in her condition and she suggested that she be taken to the orchard. Accordingly the appellee took her to the orchard and walked to the farmhouse at about 6:30 A.M. and woke Skip Peterson, the farm manager, to follow him to the orchard since the decedent was "... smashed and wants to sleep it off down there." The appellee, accompanied by Peterson, returned to the orchard and parked decedent's vehicle and rolled down the windows. The appellee then instructed Peterson to check on the decedent during the day. Peterson then returned Dr. Kominsky to the diner to get his car.

At approximately 10:30 A.M. that same day the doctor called Peterson who went down to the parked vehicle, observed the decedent and reported back to the doctor that she appeared to be sleeping. Sometime between 11:00 A.M. and 12:00 noon the decedent's daughter, Teresa, found her mother sleeping in the parked vehicle and was unable to arouse her. The alarmed thirteen year old drove her mother's car to the farmhouse where the decedent was viewed by another

daughter, Catherine. Catherine indicated that her mother was pale and "breathing funny." Catherine called Dr. Kominsky and generally described what she observed. The appellee, however, told Catherine her mother had too much to drink and that she should be returned to a shady section of the orchard. Thereupon, the decedent was taken back to the orchard. Subsequently Teresa called the appellee twice and expressed concern over her mother's condition. Each time the appellee said he would come to the farm to examine the decedent but he did not immediately do so.

Although there is some conflicting testimony as to the exact time the appellee arrived at the farm, it appears that shortly before 4:00 P.M. Peterson again checked the decedent and observed her no longer sitting up but slouched forward with her head lying on the console of the vehicle. When he observed a blue discoloration around the decedent's nose and mouth he notified the appellee who arrived between 4:00 P.M. and 4:15 P.M. accompanied by Dr. Kubecki. Peterson testified that Dr. Kominsky examined Mrs. Moore and instructed him to drive her to the hospital which he did. When they arrived at the hospital, Dr. Carroll pronounced her dead. His description of the deceased at 5:00 P.M. indicated she had no pulse, rigor mortis had set in six to eight hours before, her face was bloated and her skin was mottled.

A post-mortem examination of the deceased's body revealed that prior to her death the decedent had ingested a number of drugs including alcohol. One of the drugs, meprobamate, a depressant, had been ingested in a quantity not less than five times the normal dosage but not more than ten times the normal dosage. Various other depressants had also been ingested in an amount equal to not less than five times the normal dosage. The meprobamate and the barbiturates had been ingested not less than three hours nor more than twelve hours prior to death or the onset of the coma. The level of meprobamate above was in a quantity sufficient to constitute a

"potentially competent independent cause of death." Or, as the trial judge stated in his opinion, "if no other cause was apparent, one would be justified in concluding that the meprobamate was the actual independent cause of death." The mixing of the meprobamate with the barbiturates and alcohol had a cumulative added effect allowing the conclusion that all of the drugs and alcohol together constituted a fully competent cause of death. The record was devoid of any competent evidence showing an alternate cause of theory of death. Therefore, we are faced with a fatality with the direct cause of death clearly being an overdose of drugs which may have been compounded in effectiveness by the consumption of an unknown quantity of alcohol. The issue solely before us is whether there is sufficient competent evidence to show that the conduct of the appellee was a direct and substantial factor in producing the death in question even though other factors combined with that conduct to achieve the result. *Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974); *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600, 602 (1973).

Before granting a motion in arrest of judgment based on the insufficiency of the evidence, the court must make a finding that "the evidence supporting the verdict of guilt is so weak and inconclusive that a jury of reasonable men and women could not be satisfied as to the guilt of the defendant beyond a reasonable doubt." *Commonwealth v. Blevins,* 453 Pa. 481, 487, 309 A.2d 421, 425 (1973). Furthermore, the Commonwealth is charged with proving every essential element of the crime, including causation, beyond a reasonable doubt. *Commonwealth v. Radford,* 428 Pa. 279, 236 A.2d 802, 804 (1968); *Commonwealth v. LaPorta,* 218 Pa. Superior Ct. 1, 272 A.2d 516, 521 (1970).

The Commonwealth in the instant case specifically alleges, "It was the defendant's isolating the decedent in the orchard where she was deprived of assistance which was the act that resulted in her death." In support thereof it relies on *Skufca, supra,* by suggesting that the

above conduct of the appellee was a "direct and substantial factor in producing death even though other factors combined with that conduct to achieve the result." The Commonwealth admits that there is nothing on the record to indicate Dr. Kominsky administered the drugs which directly caused the decedent's death; however, they argue that this is as immaterial here as the fact that in *Skufca, supra,* the children died from smoke inhalation as opposed to the abandonment by the mother. With this argument and conclusion we cannot agree and note the following distinctions.

In *Skufca, supra,* the prosecution moved forward upon the misdemeanor-manslaughter theory alleging a violation by the defendant therein of the Act of June 24, 1939, P.L. 872, §727, 18 P.S. §4727. The Commonwealth under that theory was charged with showing that the unlawful conduct of the defendant, which constituted a misdemeanor, was the legal cause of their death. This the Commonwealth accomplished by showing that the mother, before going out for a social evening with friends, put her three month old and ten month old children in a bedroom and inserted table knives between the door and the jamb in order to prevent them from getting out; that the children suffocated when a fire started in the apartment; and that a neighbor who attempted to rescue the children was effectively prevented from doing so by the manner in which the door had been fastened. The abandonment of the children and the isolation of them from rescue and assistance, which constituted the misdemeanor, was indeed a direct and substantial factor in producing their death.

In the instant case there is no allegation of a misdemeanor-manslaughter theory. To the contrary the Commonwealth alleges that the appellee herein acted in a manner which in and of itself was lawful but was done in an unlawful manner. When a death results from the doing of an act lawful in itself but performed unlawfully, in order to sustain a conviction for manslaughter, the Commonwealth must present evidence to prove that the

defendant acted in a rash or reckless manner. *Commonwealth v. Feinberg*, 433 Pa. 558, 253 A.2d 636, 640 (1969). The negligence of the accused must be such a departure from prudent conduct as to evidence a disregard for human life or an indifference to the consequences. *Commonwealth v. Moore*, 463 Pa. 317, 344 A.2d 850 (1975); *Commonwealth v. Keysock*, 236 Pa. Superior Ct. 474, 345 A.2d 767 (1975). Therefore, we must decide (1) whether appellee's conduct met the standard of culpability, and (2) whether his conduct was the cause of Judy Moore's death.

When assessing the appellee's conduct definite inquiry must be made into the actual condition of the appellee's mind with regard to consequences since a certain state of consciousness with reference to the consequences of one's acts must be present. *Commonwealth v. LaPorta, supra* at 9, 272 A.2d at 520. The only reasonable inference which the record will support is that Dr. Kominsky, at the decedent's own request, placed her in an orchard where she had often slept off the effects of an over-indulgence of alcohol. This he did under circumstances where he reasonably believed she had only too much to drink, and under circumstances where an adult individual was asked to, and indeed did, monitor her condition. The assertion that the appellee knew of previous suicide attempts is correct; however, the record reveals the only such attempt that he was aware of occurred five years prior to the incident. The Commonwealth's own evidence indicates that the decedent had previously told the appellee she was through with drugs and that he was surprised that she had taken them. Furthermore, the appellee had no reason to believe that Judy Moore was so depressed by the termination of their affair to commit suicide since the relationship had ceased several months previously and the decedent during the course of their last meeting discussed her future plans. In addition, the decedent requested Dr. Kominsky to leave her in the orchard so that she would not embarrass herself by her condition in front of her

children. Certainly an attempted or successful suicide would be inconsistent with an attempted facade of propriety. Consequently, the entire record, read in a light most favorable to the Commonwealth, does not contain evidence of sufficient quality to allow an inference that Dr. Kominsky's actions were such a departure from prudent conduct as to evidence a disregard for human life or an indifference to the consequences.

As to the question of causation we must agree with the Commonwealth's argument that it need not show whether or not Judy Moore would have survived if she were transported elsewhere than to the orchard. However, the Commonwealth must prove beyond a reasonable doubt that the appellee's leaving the decedent at the orchard was a direct and substantial cause of her death. Again, viewing the evidence and inferences therefrom in a light most favorable to the Commonwealth, we find no basis other than speculation for the jury's conclusion. The Commonwealth established that the death causing drugs were taken no later than three nor earlier than twelve hours prior to Judy Moore's death. From this evidence the jury had no basis whatsoever to determine whether the drugs were ingested prior to 7:00 A.M., when the appellee left the decedent, or several hours thereafter. Any conclusions that the death causing drugs were taken at one point in time as opposed to another would be pure speculation by the jury according to the evidence on the record. In proving causation beyond a reasonable doubt the Commonwealth cannot rely on *post hoc, ergo propter hoc* reasoning and proof.

Order of the court below granting motion in arrest of judgment is affirmed.

PRICE, J., concurs in the result.