378 A.2d 1189

**COMMONWEALTH of Pennsylvania**

v.

**Michael C. POLIMENI, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 15, 1976.

Decided Oct. 7, 1977.

432

H. David Rothman, Pittsburgh, for appellant.

John J. Hickton, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

Following a trial by jury, appellant Michael Polimeni was found guilty of voluntary manslaughter in connection with the shooting death of one Kenneth Patterson. Post-verdict motions were denied, and appellant was sentenced to a term of not less than three nor more than seven years imprisonment. In this direct appeal, Polimeni raises two issues: the first, a challenge to the array of the petit jury in the court of Common Pleas of Allegheny County; the second, a denial of a requested charge on involuntary manslaughter. We find the second claim to be meritorious and that a new trial must be had. Accordingly, we do not reach the merits of appellant's challenge to the array of the petit jury.

## I.

Appellant contends that he was denied a fair trial because the trial judge declined to charge the jury, as requested, on the offense of involuntary manslaughter.[1] The point for charge was refused because the appellant had not been indicted for and thus could not properly be convicted of that offense. The trial court's action was in accord with the prevailing case law in this Court. See, e.g., *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A.2d 726 (1970); *Commonwealth v. Reid*, 432 Pa. 319, 247 A.2d 783 (1968); *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683 (1968); *Commonwealth v. Soudani*, 398 Pa. 546, 159 A.2d 687 (1960); *Commonwealth v. Comber*, 374 Pa. 570, 97 A.2d 343 (1953); *Commonwealth v. Palermo*, 368 Pa. 28, 81 A.2d 540 (1951);

1. The requested charge was as follows:

"There is a fourth type of homicide in the law of Pennsylvania; it is known as Involuntary Manslaughter. Defendant is not charged with this offense, but it is necessary that you understand what it is as an aid to your evaluation of the facts of this case. Involuntary Manslaughter does not involve malice as I have defined that term for you, malice being an essential element of murder. It is an unintentional killing, unlike Voluntary Manslaughter which is an intentional killing without malice based upon sufficient provocation.

"Involuntary Manslaughter occurs where criminal negligence is the proximate cause of a person's death. Involuntary Manslaughter occurs by the commission of a lawful act in an unlawful manner or by the commission of an act not reasonably calculated to cause death or great bodily harm, but where the act is nevertheless an unlawful one.

"In the instant case, if you find that defendant did not act with malice and that he did not intend to kill Kenneth Patterson and if you further find that defendant was resisting an attack but used excessive force—force out of proportion to what was necessary to protect himself—then you could find that defendant's resistance was the doing of a lawful act in an unlawful manner. Defendant would therefore, under those circumstances, be guilty of Involuntary Manslaughter and not guilty of the charges in the indictment before you."

We note that in the last paragraph of this point for charge the defendant's counsel was confusing some of the elements of voluntary manslaughter with those of involuntary manslaughter. This error does not, however, mean that the requested instruction taken as a whole was not sufficient to alert the court to the need to include mention of the subject matter in its charge. See *Commonwealth v. Sisak*, 436 Pa. 262, 259 A.2d 428 (1969).

*Commonwealth v. Hardy,* 347 Pa. 551, 32 A.2d 767 (1943); *Hilands v. Commonwealth,* 114 Pa. 372, 6 A. 267 (1886); *Walters v. Commonwealth,* 44 Pa. 135 (1863). But see and compare *Commonwealth v. Thomas,* 403 Pa. 553, 170 A.2d 112 (1961).

We have recently held that where it appears that the prospective evidence would support a verdict of involuntary manslaughter, it is error for the trial court to refuse to consolidate for trial an indictment for murder and voluntary manslaughter and an indictment charging involuntary manslaughter. *Commonwealth v. Moore,* 463 Pa. 317, 344 A.2d 850 (1975). See also *Commonwealth v. Stock,* 463 Pa. 547, 345 A.2d 654 (1975). The opinions by Mr. Justice EAGEN announcing the judgments of the Court in *Moore* and *Stock* did not address, because it was not necessary to do so, the issue now before us, *i.e.,* whether, absent an indictment for involuntary manslaughter, a charge on that offense is required if properly requested. On the facts presented in those cases, the failure to consolidate indictments was by itself a sufficient ground for new trials.[2] We have concluded, however, that the rationale of the *Moore* and *Stock* decisions is equally applicable to the case at bar.

The basis of the ruling in *Moore,* as set forth in the plurality opinion of Mr. Justice Eagen, is that

" . . . if a jury, giving credence to a defendant's version of an encounter could find that defendant guilty of involuntary manslaughter, fundamental fairness dictates the consolidation, upon request, of that indictment with the murder and voluntary manslaughter indictments as possible jury verdicts." 463 Pa. at 322, 344 A.2d at 852–853.

The practical consequence, indeed, the purpose of this ruling was to permit a charge of involuntary manslaughter. In the

**2.** In *Moore,* two members of this Court, Mr. Justice Roberts and the present writer, separately concluded that a defendant is entitled to a charge on involuntary manslaughter, if requested, irrespective of whether there has been an indictment for that offense, at least where the evidence is of such a nature that involuntary manslaughter would be a rational verdict, *i.e,* one supported by the evidence.

words of the plurality opinion, "failure to so acquaint the jury prevents it from operating with full knowledge of the relevant law and precludes the defendant from having a fair trial." [3] *Id.* We hold, therefore, that where in a trial of a case on a murder indictment there is present from whatever source evidence which would permit the fact-finder to return a verdict of involuntary manslaughter, a defendant is entitled, upon request, to a charge on the elements of that offense.[4]

3. In *Keeble v. United States*, 412 U.S. 205, 213, 93 S.Ct. 1993, 36 L.Ed.2d 844, 850 (1973), the Supreme Court made the following comment:

> "[W]hile we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense, it is nevertheless clear that a construction of . . . [the federal act in question] to preclude such an instruction would raise difficult constitutional questions."

4. The general rule in this jurisdiction and elsewhere is that a trial court need not charge concerning an included offense unless there is a "rational basis" for acquitting the defendant of the offense charged and convicting him of the included offense. See *Commonwealth v. Jones*, 452 Pa. 569, 308 A.2d 598 (1973); *Commonwealth v. Pavillard*, 421 Pa. 571, 220 A.2d 807 (1966). See the American Law Institute's Model Penal Code § 1.07(5) and comment thereto. Tentative Draft No. 5 of the Model Penal Code at 42.43; *Sansone v. United States*, 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882, 887–888 (1965). See also *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847 (1973); *McAllister v. State*, 74 Wis.2d 246, 246 N.W.2d 511 (1976); *People v. Johnson*, 39 N.Y.2d 364, 384 N.Y.S.2d 108, 348 N.E.2d 564 (1976); *State v. Dougherty*, 550 P.2d 175 (Utah 1976).

In part II of this opinion, *infra*, we conclude that there was evidence in this case from which the jury could justifiably have found that the appellant, while not guilty of murder, was guilty of involuntary manslaughter. Consequently, there is no need for us now to decide whether and under what circumstances a different rule, not dependent on evidential considerations, should be adopted in Pennsylvania. This question has not been argued to us and we express no opinion upon it. As Mr. Justice Roberts put it in *Commonwealth v. Moore*, 463 Pa. 317, 344 A.2d 850, 855–56 (1975), we "need not decide whether rationality should be a requirement for a permissible verdict, for in this case, a verdict of involuntary manslaughter would have been rational." 463 Pa. at 328, 344 A.2d at 856 (concurring opinion of Roberts, J.).

To be contrasted with the general rule is the situation which obtains in Pennsylvania relative to voluntary manslaughter, long recognized in this jurisdiction as a lesser included offense of murder;

■   It is arguable that the result we reach today could be derived through application of the common-law concept of lesser included offenses [5] and a determination that involun-

the court on request must charge on that offense regardless of whether there is any evidence to support such a verdict. See *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974); *United States ex rel. Matthews v. Johnson*, 503 F.2d 339 (3d Cir. 1974), *cert. denied*, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975); *Commonwealth v. Cain*, 471 Pa. 140, 369 A.2d 1234 (1977). See also *Commonwealth v. Matthews*, 446 Pa. 65, 78, 285 A.2d 510 (1971) (dissenting opinion of this writer, joined by Mr. Justice ROBERTS). The reasons for this are historical: it having long been the law in Pennsylvania that a jury has the "power" to return a verdict of voluntary manslaughter on a murder indictment even absent any evidence of the elements of manslaughter, see, *e.g.*, *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A.2d 726 (1970), due process of law was violated in the failure to charge on that offense on request. In contrast, the law in Pennsylvania until now has been that a jury had no power to return a verdict of involuntary manslaughter absent an indictment for that offense. The voluntary manslaughter anachronism is thus no precedent for what the rule should be with respect to involuntary manslaughter.

**5.** The doctrine of lesser-included offenses is of common law origin. See, *e.g.*, *Kelly v. United States*, 125 U.S.App.D.C. 205, 370 F.2d 227, *cert. denied*, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1966); *United States v. Markis*, 352 F.2d 860 (2d Cir. 1965); *Commonwealth v. Kellyon*, 278 Pa. 59, 122 A. 166 (1923); *Hunter v. Commonwealth*, 79 Pa. 503 (1875); *Commonwealth v. Gable*, 7 S. & T. 433 (1829); F. Wharton, Criminal Law and Procedure (13th ed., 1972, C.E. Torcia ed.) § 545; C.A. Wright, 2 Federal Practice and Procedure § 515, at 372 (1969); American Law Institute, Model Penal Code § 1.07(4) (Proposed Official Draft, 1962). The common law concept is succinctly stated in Rule 31(c) of the Federal Rules of Criminal Procedure:

"(c) *Conviction of Less Offense.* The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

For a discussion of federal case law defining the phrase "necessarily included" under this rule, see J. Wm. Moore, 8 Moore's Federal Practice § 31.03 (1972).

The concept of "lesser included" offenses is not always confined to those which are "necessarily included", either by statutory definition or by reason of the facts in a particular case, although the terms are frequently used interchangeably. Offenses which are "lesser included" even though not "necessarily" in that category are sometimes called "cognate lesser included offenses." For discussions of the problems of definition and application involved in the included offenses concept, see, *inter alia*, D. Koenig, *The Many-Headed Hydra of Lesser Included Offenses: A Herculean Task for the Michigan Courts*, Vol. 1975 Detroit College of Law Review 41 (1975); B.

tary manslaughter, like voluntary manslaughter, is a lesser included offense of murder.[6]  Voluntary manslaughter has long been so regarded in Pennsylvania,[7] and authority elsewhere would support the proposition that, properly considered, involuntary manslaughter is also a lesser included offense of murder.[8]  We need not, however, consider whether the common law rule in Pennsylvania should be changed, for we are of the opinion that our holding in the case at bar is required by the new Pennsylvania Crimes Code, 18 Pa.C.S.

George, *Lesser Included Offenses in Michigan*, Vol. 1975 Detroit College of Law Review 35 (1975);  J. Barnett, *The Lesser-Included Offense Doctrine: A Present Day Analysis for Practitioners*, 5 Conn. L.Rev. 255 (1972);  Note, *The Doctrine of Lesser Included Offenses in Kansas*, 15 Washburn L. Journal 40 (1976);  Note, *Lesser Included Offenses: Application of Equal Standards to the Prosecution and Defense in Lesser Included Offense Situations*, 4 Toledo Law Review 273 (1973).

6.  The Model Penal Code § 1.07(4), note 5, *supra*, provides that one offense is included in another when

"(a) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;  or (b) it consists of an attempt or solicitation to commit the offense charged or to commit an offense otherwise included therein;  or (c) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission."

We note that the General Assembly, although adopting portions of the Model Penal Code into the Crimes Code, did not incorporate § 1.07(4) of the Model Code.  We do not, however, consider this a mark of disapprobation of the Model Code formulation of the doctrine of lesser-included offenses.

7.  See, *e.g.*, *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974); *Commonwealth v. Bailey*, 450 Pa. 201, 299 A.2d 298 (1973);  *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972);  *Commonwealth v. Banks*, 447 Pa. 356, 285 A.2d 506 (1971);  *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510 (1971);  *Commonwealth v. Hoffman*, 439 Pa. 348, 266 A.2d 726 (1970);  *Commonwealth v. Flax*, 331 Pa. 145, 200 A. 632 (1938);  *Commonwealth v. Curcio*, 216 Pa. 380, 65 A. 792 (1907).  *See* note 4, *supra*.

8.  See, *e.g.*, *McDonald v. State*, Ind., 346 N.E.2d 569 (1976);  *People v. Heffington*, 32 Cal.App.3d 1, 107 Cal.Rptr. 859 (1973);  *Hewitt v. Commonwealth*, 213 Va. 605, 194 S.E.2d 893 (1973);  see also *People v. Jones*, 395 Mich. 379, 236 N.W.2d 461 (1975);  Homicide, 40 Am.Jur.2d § 543 n.18 at 802;  Anno., 102 A.L.R. 1019 (1936);  Anno., 27 A.L.R. 1097 (1923);  Anno., 21 A.L.R. 603 (1922).

§ 101 *et seq.*,[9] which was in effect at the time of the commission of the crimes here involved. This case being one of first impression under the Code,[10] it is necessary to consider the structure of that legislation and the definitions therein contained by which we must be guided.

The Crimes Code in Chapter 25, for the first time in Pennsylvania, establishes an offense known as "criminal homicide". A person is guilty of this crime "if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. § 2501(a). The Code then states that "[c]riminal homicide [is] *classified* as murder, voluntary manslaughter, or involuntary manslaughter." *Ibid.* § 2501(b). (Emphasis supplied.) Murder is in turn divided into three categories: murder of the first degree, murder of the second degree, and murder of the third degree. *Ibid.* § 2502.[11] Murder of the first degree and of the second degree under the Crimes Code together correspond to murder in the first degree under prior law; the new murder of the first degree is an intentional killing, while the new murder of the second degree is felony-murder. Murder of the third degree is comprised of "all other kinds of murder" 18 Pa.C.S. § 2502(c) (Supp. 1977–1978), thus taking the place of the former murder in the second degree, which the Penal Code described in the same words.[12] The

9. Act No. 334 of 1972, enacted December 6, 1972, and effective six months thereafter, as amended by the Act of March 26, 1974, P.L. 213, No. 46 § 4, 18 Pa.C.S. § 2502 (Supp. 1977–78).

10. Cf. *Commonwealth v. Moore*, 463 Pa. 317, 344 A.2d 850 (1975), *supra*, and *Commonwealth v. Stock*, 463 Pa. 547, 345 A.2d 654 (1975), *supra*, both of which arose under the Penal Code, Act of June 24, 1939, P.L. 872, § 701, *as amended*, 18 Pa.C.S.A.App. § 4701, predecessor statute to the Crimes Code.

11. This further subdivision of murder so as to create a third degree of that offense was added to the Crimes Code by the Act of March 26, 1974, P.L. 213, No. 46 § 4, 18 Pa.C.S. § 2502 (Supp. 1977–78).

12. Act of June 24, 1939, P.L. 872 § 701, *as amended*, 18 Pa.C.S.A. App. § 4701. The definition of this classification of criminal homicide under the Crimes Code, therefore, like the definition of murder in the second degree under the former Penal Code, is to be derived from the common law. See *Commonwealth v. Drum*, 58 Pa. 9

remaining two species of criminal homicide are voluntary manslaughter and involuntary manslaughter. They also are defined in the Crimes Code in the same basic terms as in prior law.[13] 18 Pa.C.S. §§ 2503, 2504.

We think that the structure of Chapter 25 of the Crimes Code in which the above cited sections appear is such as to create one major homicide offense, that of criminal homicide, and that the several types of homicide, namely, murder of any of the three named degrees and voluntary and involuntary manslaughter are constituent subsidiary offenses within the single major offense. All grades of unlawful killing thus have been made lesser included offenses of the overall crime of criminal homicide.[14] The differences between the classifications are largely a function of the state of mind of the perpetrator. This becomes clear when one examines the ranking for culpability purposes of

(1868). See also *Commonwealth v. Palmer,* 448 Pa. 282, 292 A.2d 921 (1972); *Commonwealth v. Tyrrell,* 405 Pa. 210, 174 A.2d 852 (1961); *Commonwealth v. Daley,* 2 Clark 361 (1844). "Malice" is an essential element of this variety of homicide. *Commonwealth v. Boyd,* 461 Pa. 17, 22–23, 334 A.2d 610, 613 (1975); *Commonwealth v. Buzard,* 365 Pa. 511, 76 A.2d 394 (1958); *Commonwealth v. McLaughlin,* 293 Pa. 218, 142 A. 213 (1928). See also *Commonwealth v. Hornberger,* 441 Pa. 57, 270 A.2d 195 (1970); *Commonwealth v. Malone,* 354 Pa. 180, 47 A.2d 445 (1946). Mr. Justice Agnew's description of malice in *Commonwealth v. Drum, supra,* is still the classic statement of that element of criminal homicide:
"Malice . . . comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, *recklessness of consequences,* and a mind regardless of social duty . . . ." (emphasis added). 58 Pa. at 15.

13. *Cf.* the prior provision in the Penal Code, Act of June 24, 1939, P.L. 872, § 703, 18 Pa.C.S.A.App. § 4703. For culpability purposes, the new Code grades voluntary manslaughter as a felony of the second degree for conviction of which a sentence to a term of imprisonment of not more than ten years may be imposed; involuntary manslaughter is classed as a misdemeanor of the first degree, carrying a maximum sentence of five years imprisonment. See 18 Pa.C.S. § 106.

14. Causing or aiding suicide is also a ground for conviction of criminal homicide. 18 Pa.C.S. § 2505. Such conduct is not, however, stated to be a "classification" of criminal homicide. See 18 Pa.C.S. § 2501(b).

the several categories of criminal homicide.[15] Premeditated, intentional killing and killing in the course of committing a felony continue to be equated as the most highly culpable classes of criminal homicide.[16] A felonious and malicious killing *without* a specific intent to take life (murder of the third degree, formerly second degree) is placed by the Code in the next highest degree of culpability, a felony of the first degree. 18 Pa.C.S. § 2502(c). Next in seriousness is a killing which, although intentional, is committed when the actor is under the influence of a sudden and intense passion resulting from serious provocation or is acting in the unreasonable belief that the circumstances would justify a killing. This subdivision of criminal homicide, voluntary manslaughter, is punishable as a felony of the second degree. 18 Pa.C.S. § 2503. Involuntary manslaughter, with which we are here concerned, is committed when the death of a person is caused as a direct result either of a lawful act or of an unlawful act done in a "reckless or grossly negligent manner," 18 Pa.C.S. § 2504.[17] In the scale of culpability, such a killing is a misdemeanor of the first degree. *Id.* § 2504(b).

**15.** The punishments which the Crimes Code attaches to the several classifications of crimes are set forth in § 106 of the Code.

**16.** Both are grouped together under the rubric of "murder of the first degree" as the first category of crime for culpability purposes, *i. e.,* permissible sentences applicable to different classes of criminal offenses. 18 Pa.C.S. § 106 (Supp. 1977–78).

**17.** "Recklessly" is defined in 18 Pa.C.S. § 302(b)(3):
"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."
"Negligently" is defined in 18 Pa.C.S. § 302(b)(4):
"A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation."

Like murder of the third degree, involuntary manslaughter is an *un*intentional killing. See *Commonwealth v. Jones*, 452 Pa. 569, 308 A.2d 598 (1973). What is more important for our present purposes is the fact that under the Crimes Code it is a killing which requires a state of mind which is in effect simply a gradation on the ascending scale of culpability culminating in malice. The state of mind which characterizes involuntary manslaughter is not malicious; it is referred to as "criminal negligence" and is evidenced by acts, whether lawful or unlawful, done in a "reckless or grossly negligent" manner as those terms are defined. See 18 Pa.C.S. § 2504; ·see also n. 17, *supra; Commonwealth v. Jones*, 452 Pa. 569, 578–79, 308 A.2d 598 (1973). In *Commonwealth v. Aurick*, 342 Pa. 282, 288–89, 19 A.2d 920, 923 (1941), this Court stated that to constitute involuntary manslaughter " '[t]he negligence must be such a departure from what would be the conduct of an ordinary prudent or careful man under the circumstances as to evidence a disregard of human life or an indifference to consequences.' " See also *Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961); *Commonwealth v. LaPorta*, 218 Pa.Super. 1, 272 A.2d 516 (1970); *Commonwealth v. Clowser*, 212 Pa.Super. 208, 239 A.2d 870 (1968); *Commonwealth v. Hartle*, 200 Pa.Super. 318, 188 A.2d 798 (1963).

We thus hold, to summarize, that because the legislature has classified both murder and involuntary manslaughter as subdivisions of the major offense of criminal homicide, a defendant who has been charged with murder is entitled on request to have the jury instructed on the elements of involuntary manslaughter at least where evidence is presented at his trial on which a verdict of that less serious offense could rationally be based.[18]

The Crimes Code definitions of the two types of manslaughter are substantially the same as under prior law. See *Commonwealth v. Moore, supra,* 463 Pa. at 330, n. 15, 344 A.2d at 857, n. 15 (concurring opinion of ROBERTS, J.).

18. Whether the trial judge may so instruct the jury *sua sponte* is not now before us. See and compare *Walker v. United States,* 135 U.S.App.D.C. 280, 418 F.2d 1116 (1969); *State v. Herron,* 349 S.W.2d

## II.

■ It remains to determine whether from the evidence in this case a jury might rationally conclude that Michael Polimeni was guilty of involuntary manslaughter. As noted above, the Crimes Code definition of involuntary manslaughter is substantially declaratory of our previous law:

"A person is guilty of involuntary manslaughter when as a direct result of the doing of a lawful action in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a) (1973).

*See also* 18 Pa.C.S.A. § 302(b)(3) and 302(b)(4) (1973), *supra* n. 17, where the Code defines reckless and negligent conduct. Viewing the evidence in the light most favorable to the appellant [19] we must then determine whether the jury could find defendant's actions to have been unintentional but "reckless or grossly negligent" within the meaning of the Code provisions. The evidence at trial showed the following sequence of events: [20]

On the evening of August 22, 1973, Michael Polimeni, the appellant, invited one Nicky Dellaquilla and one William Grande to the house appellant shared with his brother, Peter Polimeni. The purpose for the proposed meeting was to discuss some missing pills and a pill bottle belonging to Polimeni which he believed Dellaquilla had stolen. When Dellaquilla and Grande arrived at appellant's home at about 11:30 p. m., there were with them four other men: David Dowling, John Dyer, Frederick Kostanich and Kenneth Patterson. Surprised at seeing the others, appellant went into his bedroom alone, removed a loaded .38 caliber pistol from the safe there and placed the gun in his back trouser pocket.

936, 940 (Mo.1961); *Tarter v. State*, 359 P.2d 596, 600 (Okl.Cr.App. 1961); *State v. Nodine*, 198 Or. 679, 259 P.2d 1056 (1953).

19. *Commonwealth v. Moore, supra*, 463 Pa. at 321–22, 344 A.2d at 852.

20. This account is primarily a summary of Michael Polimeni's own testimony.

He thereupon joined the others, including his brother Peter, in the downstairs game room. A discussion ensued between himself and Dellaquilla concerning the missing pills, with the appellant at one point threatening to notify the police of Dellaquilla's alleged thievery. At that point, Kostanich intervened and turned the discussion towards an auto theft and crash involving Dellaquilla, one Churchill and a car belonging to a friend of Polimeni's.

Appellant began to poke Kostanich in the chest and request that he depart from his home. It was then that Patterson, who apparently had been about to leave, came back into the game room, raised his right hand into the air and announced, "This is the hand of God." Polimeni responded, "Well, f-u- and the hand of God." Patterson then advanced on Polimeni, grabbed him around the neck and began choking him, saying, "This is the hand of God, it is going to kill you." At this point Peter Polimeni joined the scuffle and removed Patterson's hands from his brother's neck, but Patterson again grabbed at Michael Polimeni, who then removed the gun from his pocket and said to Patterson, "Get out of my house or I'll shoot." "Shoot, mother f'r," responded Patterson. Beginning to feel faint and as if he might "black out," appellant pushed Patterson away from him with one hand, and with the other began to fire his gun. He emptied the five shot pistol, striking Patterson three times and wounding him mortally.[21]

21. Michael Polimeni testified as follows on direct examination:
". . . . I kind of felt motion from the right side of me so I kind of turned and then Patterson grabbed me again and that's when I went back and pulled the gun out. I said, 'Get out of my house or I'll shoot you,' and he said, 'Shoot, mother f'r,' and I kind of started fainting and—started blacking out. And then I was trying to push him off me and I was shooting at the same time.
\* \* \* \* \* \*
"My head was kind of swelling. The only thing I knew, my head was getting heavier and heavier. I just kept on shooting the gun." N.T. 293–4.
\* \* \* \* \* \*
"Q. Were you aiming the gun at all?
A. I don't know if I was aiming it, I was just pushing and shooting the gun." N.T. 295.
\* \* \* \* \* \*

From this account, three defense arguments may be drawn: (1) Polimeni justifiably killed Patterson in self-defense, and was guilty of no crime; (2) Polimeni's fear of his life was not reasonable, or he used excessive force in countering Patterson's attack on him, in either of which events appellant's crime would be voluntary manslaughter; (3) Polimeni's actions were reckless in that he consciously disregarded a substantial and unjustifiable risk that death or serious bodily harm might result to Patterson from Polimeni's pulling his gun and firing, in which case appellant would be guilty of involuntary manslaughter. 18 Pa.C.S.A.

"Q. Can you describe to us the sensation you felt when he grabbed you?
A. I just felt like my head was getting heavier and heavier and I was getting light headed like, and I was just getting scared and start [sic] shooting." N.T. 299.

\* \* \* \* \* \*

"Q. Did you consciously point the weapon at Patterson?
A. Consciously? I kind of pulled it out, aimed—didn't really aim, just pulled it out kind of in the direction our bodies were, so I didn't know what part of his body I was aiming at or anything." N.T. 300.

\* \* \* \* \* \*

"Q. Was it your intention to kill him?
A. No sir.
Q. What was your intention?
A. Get him off me." N.T. 300–01.

On cross-examination Polimeni testified in part as follows:
"Q. How much time elapsed between the first and second shots?
A. After I shot the first shot I didn't know if I hit him or what, and I was still trying to push him, I was hesitant on the second shot because I didn't know if I hit him or what, but he still seemed pretty strong and I was still like getting, you know, like going out, and I just started pressing the trigger after that.

\* \* \* \* \* \*

"Q. Were you aiming at Kenneth Patterson?
A. I guess so, I pulled it out and he was in the general vicinity. I wasn't aiming for a specific part of the body or anything.
Q. You knew you were aiming at him?
A. Yes sir." N.T. 340.

The prosecution version of what occurred that evening differed from the above in the following particulars: the alleged purpose of the meeting in Polimeni's house was to discuss the stealing and wrecking of a car belonging to one Klingensmith; Patterson never actually grabbed appellant and said only "Take it easy man, don't worry about it, God will take care of it"; nonetheless, appellant started to scream, pulled the gun and fired five times, twice after Patterson had been felled.

§ 2504(a); 18 Pa.C.S. § 302(b)(3). The third alternative is weakened, to be sure, by appellant's admission that he knew he was aiming the gun at the victim, but this came on cross-examination after appellant had given conflicting versions ("I don't know if I was aiming it"; ". . . didn't really aim, just pulled [the gun] out kind of in the direction our bodies were, so I didn't know what part of his body I was aiming at or anything.") Despite the ambiguity and ambivalence of these statements the jury could have concluded that Polimeni's conduct was in the category of recklessness (involuntary manslaughter) rather than of intentional killing either under sudden and intense passion resulting from serious provocation by Patterson or in the unreasonable belief that the killing would be justified (voluntary manslaughter).

The resolution of these conflicting interpretations of the facts is for the jury, which, of course, has authority to believe all, part of or none of a witness' testimony. *Commonwealth v. Marlin*, 452 Pa. 380, 305 A.2d 14 (1973); *Commonwealth v. Oates*, 448 Pa. 486, 295 A.2d 337 (1972); *Commonwealth v. Petrisko*, 442 Pa. 575, 275 A.2d 46 (1971).

In conclusion, we think that Mr. Justice EAGEN's statement in *Commonwealth v. Stock, supra*, 463 Pa. at 553, 345 A.2d at 657 (opinion announcing the decision of the Court) is equally germane to the case at bar:

"We believe the evidence presented would have supported a verdict of involuntary manslaughter. The jury, crediting Stock's testimony could have determined the fatal wounding of Rhodes was unintentional and accidental. Furthermore, the jury, applying its knowledge and experience, could have concluded that Stock's conduct which contributed to the killing, while unlawful and criminally negligent within the definition of involuntary manslaughter, was not so negligent as to reach the level of recklessness and wantonness required for a murder conviction. Therefore, since the jury could have viewed Stock's conduct as coming within the ambit of involuntary manslaughter, it was error for the trial court . . . [not]

to present involuntary manslaughter as a possible verdict." (Footnotes omitted)

Judgment of sentence is reversed and case remanded for a new trial.

JONES, former C. J., did not participate in the decision of this case.

ROBERTS, J., filed a concurring opinion in which O'BRIEN, J., joins.

MANDERINO, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion.

. ROBERTS, Justice, concurring.

For the reasons stated in *Commonwealth v. Garcia,* 474 Pa. 449, 378 A.2d 1199 (1976) (plurality opinion), I believe that a defendant is entitled upon request to a charge on involuntary manslaughter in every prosecution for criminal homicide under the Crimes Code, 18 Pa.C.S.A. § 2501 (1973). I therefore agree with the majority that appellant is entitled to a new trial.

O'BRIEN, J., joins in this concurring opinion.

MANDERINO, Justice, concurring.

I agree with the majority that appellant is entitled to a new trial because one accused of criminal homicide is entitled to an instruction on involuntary manslaughter, if requested, whether or not there is any "rational basis" in the mind of the trial judge for such a verdict.

To refuse to hold that it is error not to instruct on involuntary manslaughter, even in a case where there is no "rational basis" upon which the jury could return such a verdict sets the stage for the same issue which confronted this Court previously concerning voluntary manslaughter.

The problem in the voluntary manslaughter area began when a jury returned a verdict of voluntary manslaughter even though there had been no charge as to voluntary

manslaughter. We were then confronted with the issue of whether to accept the voluntary manslaughter verdict (for which there had not been a charge) or refuse to accept the voluntary manslaughter verdict as valid. If the voluntary manslaughter verdict had not been accepted, the Court, of necessity, would have had to enter a verdict of acquittal overruling the jury's verdict of guilty of voluntary manslaughter. This Court refused to ignore the voluntary manslaughter verdict under such circumstances, and held that it was within the authority of the jury to return such a verdict, even though the jury had not been instructed on voluntary manslaughter.

What happens when jurors return a verdict of involuntary manslaughter, even though they have not been charged on that crime, because in their wisdom they believe that a lesser degree of guilt is involved in the case? This Court will then have to decide, as it once did in the voluntary manslaughter area, whether to accept the involuntary manslaughter verdict as valid, even though the jury was not charged on the crime, or to refuse to accept the jury's verdict and enter a verdict of acquittal.

The proper justice in a given case frequently involves close questions. I do not understand why judges or justices assume that they, rather than juries, can best resolve the close questions. We should eliminate artificial limitations on a jury's deliberations. The jury should be charged on involuntary manslaughter in all cases of criminal homicide. If in its wisdom a jury decides that involuntary manslaughter is a proper verdict, a judge should not disturb that verdict. There is no reason to fear that juries will irrationally return an involuntary manslaughter verdict in cases where there is no basis of any kind for such a verdict. The jury may, however, out of superior reasoning or compassion, disagree with the trial judge and bring in a verdict of involuntary manslaughter even though there is no "rational basis" in the court's mind for such a verdict.

In such close cases, I prefer the wisdom of twelve persons to that of a single judge. The ultimate justice of a given

449

case is more properly the prerogative of a jury than of a judge.

NIX, Justice, dissenting.

I dissent for the reasons set forth in my dissent in *Commonwealth v. Garcia,* 474 Pa. 449, 378 A.2d 1199 (filed Oct. 7, 1977).